**KING & BALLOW**
RICHARD S. BUSCH (TN Bar No. 014594)
(*Pro Hac Vice*)
rbusch@kingballow.com
315 Union Street, Suite 1100
Nashville, Tennessee 37201
Telephone: 615.259.3456
Facsimile:  615.726.5417

**KING & BALLOW**
PAUL H. DUVALL (Bar No. 73699)
pduvall@kingballow.com
6540 Lusk Boulevard; Suite 250
San Diego, CA 92121
Phone: 858.597.6000
Facsimile:  858.597.6008

**WARGO FRENCH LLP**
MARK L. BLOCK (SBN115457)
mblock@wargofrench.com
1888 Century Park East
Suite 1520
Los Angeles, CA 90067
Telephone: 310-853-6355
Facsimile: 310-553-5317



FILED
CLERK, U.S. DISTRICT COURT

AUG - 1 2012

CENTRAL DISTRICT OF CALIFORNIA
BY___ DEPUTY

Attorneys for Plaintiff FELICE CATENA

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

FELICE CATENA,

               Plaintiff,

v.

CAPITOL RECORDS, LLC, f/k/a
CAPITOL RECORDS, INC., A
DIVISION OF EMI MUSIC NORTH
AMERICA, LLC,

               Defendants.

RECEIVED
BUT
NOT FILED

AUG - 1 2012
2:46

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY___ DEPUTY

Case No. CV12- 806 MMM (JCx)

Action Filed: December 22, 2011

**AMENDED COMPLAINT FOR:**

**(1) BREACH OF CONTRACT;**
**(2) VIOLATION OF THE**
    **CALIFORNIA UNFAIR**
    **COMPETITION ACT;**
**(3) ACCOUNTING; AND**
**(4) DECLARATORY JUDGMENT.**

**DEMAND FOR JURY TRIAL**

**AMENDED COMPLAINT**

Plaintiff, FELICE CATENA,  ('Plaintiff") by and through her attorneys, for

AMENDED COMPLAINT

1

her Complaint against the Defendant, CAPITOL RECORDS, INC., A DIVISION OF EMI MUSIC NORTH AMERICA, LLC, ("Defendant") allege as follows:

## JURISDICTION AND VENUE

1. Plaintiff initiated this action by filing her Complaint on December 22, 2011 in the California Superior Court for the County of Los Angeles, Central Division. On January 30, 2012, pursuant to 28 U.S.C. §§ 1332(a) and 1441(a), Defendant Capitol Records, LLC removed this action to the United States District Court for the Central District of California on the alleged grounds that: (1) this is a civil action over which this District Court has original jurisdiction under 28 U.S.C. § 1332(a), and which Defendant is entitled to remove to this Court pursuant to 28 U.S.C. § 1441(a); (2) removal to this Judicial District is proper under 28 U.S.C. § 1446(a) because this District includes the County of Los Angeles, in which this action was originally pending; and (3) this action is removed on the basis of diversity jurisdiction in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and the action is between citizens of different states. *See* DE 10.

## NATURE OF THE ACTION

2. Plaintiff is the heir and legal rights holder to the intellectual property and estate of her deceased brother, Bruce Gary ("Gary"), a member of the musical group known as "The Knack," whose major hit songs include "My Sharona," a

number one single in 1979 and "Good Girls Don't." The group's debut album, "Get the Knack," sold over 2 million copies in the United States and over 6 million copies worldwide.

3.     This action for breach of contract, unfair competition, an accounting and for a declaratory judgment is brought against Defendant named herein arising from Defendant's willful and knowing failure to properly account to and pay Plaintiff royalties, pursuant to the recording agreement between the musical group "The Knack" and Defendant, dated February 22, 1979, and all subsequent amendments and supplements thereto, (collectively, the "Recording Agreement," attached to this Complaint as **Exhibit A**,), with respect to certain master recordings ("Masters") of the musical performances by "The Knack" which have been licensed by Defendant to "Music Download Providers," and then sold by these third parties to the general public as more fully described herein below.

4.     This action is predicated on Defendant's failure to properly account to and pay Plaintiff for income it has received, and continues to receive, from the licensees of the Masters for the sale of digital downloads and ringtones (or "mastertones").

5.     Plaintiff alleges, and the Ninth Circuit Court of Appeals has ruled, that digital download and ringtone income received by record companies derives from a license.  Holding that record companies' agreements with "iTunes [the

marketplace's primary source for legitimate digital downloads of recorded music], cellular phone carriers [like Verizon and AT&T] and other third parties to use its sound recordings to produce and sell permanent downloads and mastertones…qualify as licenses," the Ninth Circuit ruled that record companies should treat income derived from those agreements as licensing income and to account to and pay the royalty participants in that case accordingly. *F.B.T. Productions, Inc. v. Aftermath Records,* 621 F.3d 958 (9th Cir. Sept. 3, 2010), *cert. denied,* 131 s. Ct. 1677 (U.S. 2011). Through this lawsuit, Plaintiff seeks to compel Defendant to account to and pay the rightful share of licensing income paid to Defendant for downloads and ringtones of the recorded music licensed by Defendant to these entities.

6.     This action seeks redress for Defendant's continuous violation of the terms of the Recording Agreement with Plaintiff, who has the contractual right to a larger percentage of the income Defendant receives from licensing of the Masters to others to produce and sell permanent downloads and ringtones.   Plaintiff believes that discovery will show that in regard to her rights, Defendant adopted a policy and practice of paying or crediting artists and producers, including Plaintiff, a fraction of the monies due and owing for the licensing of their music for these uses.

AMENDED COMPLAINT

4

7.     Defendant's conduct has substantial monetary consequences for not only Plaintiff, but, as Plaintiff believes discovery will show, for the community of artists at large. Under such a policy of underpayment of royalties, for every dollar Defendant would actually account for, pay or credit its artists and producers for digital download and ringtone income, it should have been accounting for, paid or credited anywhere between two and five dollars.

8.     Defendant has systematically violated its contractual obligations to make proper royalty payments and/or to properly credit royalty accounts pursuant to agreements between it and Plaintiff and, as Plaintiff believes discovery will show, to other recording artists, music producers and royalty participants as well. As explained below, the failure to pay Plaintiff appropriately for permanent downloads, mastertones, and ringtones is, upon information and belief, part of a conscious decision by Defendant, and others in the music business, to knowingly and fraudulently deprive artists of their proper royalties for the licensing of master recordings for sale or distribution by third party Music Download and Mastertone Providers, and violates California's Unfair Competition Law, Bus & Prof. Code §17200, et seq.

9.     As a consequence of Defendant's past and continuing contractual and statutory violations, Plaintiff has been damaged through the loss of royalties which Defendant has retained for its own benefit.

AMENDED COMPLAINT

5

10.    Plaintiff is informed and believes that discovery will reveal that before reaching its obligations to its royalty participants, Defendant knew that it was underpaying digital download royalties to its artists, and was advised of such by a letter sent on March 24, 2004, from twenty-seven of the most powerful attorneys in the music industry to representatives of the major record companies, including directly to David Munns, then Chairman and CEO of EMI Music North America. (March 24, 2004 Letter, attached hereto as **Exhibit B**).

11.    Upon information and belief, Defendant vetted the policies and practices at issue in this case at its highest corporate levels; analyzed internally the financial consequences of its misconduct and cast it in terms of the additional profit to be made by Defendant by avoiding its contractual obligations; and formulated an opaque and artificial method for accounting for and paying its royalty participants for income derived from such licenses.    Furthermore, Defendant employed, and continues to employ, a host of unfair tactics and strategies in its dealings with royalty participants to minimize its exposure from the unlawful conduct at issue here, all of which were also subject to consideration, review and approval by and among Defendant's highest placed officers and directors.

12.    Plaintiff seeks compensatory damages for breach of contract. Plaintiff further seeks injunctive relief and restitution, dating back to Defendant's initial

wrongdoing, for violations of California's Unfair Competition Law. Additionally, Plaintiff seeks an accounting of monies owed to her under the Recording Agreement. Plaintiff further seeks a declaration, pursuant to 28 U.S.C. § 2201, declaring Plaintiff's rights pursuant to the Recording Agreement and the proper method of calculating royalty payments or crediting royalty accounts with respect to third party digital sale and distribution of the Masters by Music Download Providers, and requiring that Defendant adhere to the proper method of calculating such royalties in the future.

## PARTIES

13.  Plaintiff Felice Catena is a resident of Encino, California.

14.  Defendant Capitol Records, LLC, formerly known as Capitol Records, Inc., a division of EMI Music North America, LLC, is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

## GENERAL ALLEGATIONS

15.  Pursuant to the terms of the Recording Agreement, Plaintiff caused certain recorded performances, the Masters, to be delivered to Defendant, and Defendant agreed to manufacture, distribute, sell, and license for sale and distribution those Masters in various configurations.

16. The terms of the Recording Agreement dictate the amount of royalties Defendant must pay to Plaintiff for Defendant's licensing of the Masters, stating in pertinent part:

> With respect to any use of masters recorded hereunder…by a licensee of Capitol or a licensee of Capitol-Canada, whether for the manufacture of records or other wise and regardless of whether fees to Capitol are based on a "flat fee" or "cent rate" basis or, in the U.S.A. and Canada on a percentage basis, then in lieu of any other royalty specified in this agreement **Capitol shall pay me 50% of Capitol's net receipts** from such licensee with respect to such use of the applicable masters, computed on the same quantity, basis and in the same manner as Capitol is paid. (emphasis added)

17. Defendant has licensed the Masters to third parties including Music Download Providers such as Apple (iTunes), eMusic, Amazon, Verizon, T-Mobile, and others, so that those third party Music Download Providers could manufacture and sell music downloads, master tones and ring tones to the public. Defendant received monies for this licensing and continuously and persistently failed to account to and pay the members of "The Knack" the 50% of net receipts due to the members of "The Knack" pursuant to the terms of the Recording Agreement.

18. Instead, Defendant has systematically accounted to and paid members of the group "The Knack" for the Masters licensed at lower royalty rates, under provisions of the Recording Agreement which they knew were applicable only to phonorecords sold by Defendant, not the licensing of the Masters. Defendant had a

AMENDED COMPLAINT

8

strong, but unlawful, financial incentive to incorrectly pay Plaintiff for its licensing of the Masters to Music Download and Mastertone Providers because of the rising income from Masters licensed to Music Download and Mastertone Providers beginning in the early part of the last decade and continuing into the foreseeable future.

19.    As alleged more specifically below, Defendant knew, recklessly disregarded, or should have known its obligations in properly paying and accounting to Plaintiff. Defendant's actions, in refusing to properly account to and pay Plaintiff, was fraudulent, unlawful, unfair, and/or deceptive and constitutes a violation of California's Unfair Competition Law.

20.    Indeed, upon information and belief, Defendant systematically eschewed its obligations to Plaintiff, similarly situated artists, and others after Defendant: vetted applying policies and practices at issue in this matter at its highest corporate levels, analyzed internally the financial consequences of its misconduct in terms of additional profit to be made by Defendant by avoiding its contractual obligations, and formulated an opaque and artificial method for accounting for and paying its royalty participants for income derived from licensing the Masters to Music Download and Mastertone Providers. Further, upon information and belief, Defendant has employed and continues to employ a host of unfair tactics and strategies in its dealings with Plaintiff and other royalty

participants to minimize Defendant's exposure from the unlawful conduct at issue here.

21. Finally, the actions of Defendant were part of an ongoing and deliberate attempt by the major record companies, including Defendant, to deprive artists, like Plaintiff, in California, and elsewhere, of their rightful royalties for music downloads, mastertones, and ringtones.

22. On March 24, 2004, twenty-seven of the most powerful attorneys in the music industry sent a letter directly to the executives of the then five leading record companies, including David Munns, then Chairman and CEO of EMI Music North America, which noted that "[r]ather than recognize the arrangements between the major labels and independent electronic distributors as licenses, for which we feel there can be no *bona fide* legal dispute, and paying our clients according to the applicable provision of their contracts, …[EMI has] adopted the position that paid downloads are equivalent to sales of CDs through retailers…[t]he impact of this collective action by the record companies…deprives our clients of the benefits of their contracts, and unjustly enriches the labels…paying the artists a mere fraction of their entitlement will validate consumers' feelings that choosing to pay for legitimate downloads in lieu of illicit file sharing will not ultimately benefit the artists…" (March 24, 2004 Letter, attached hereto as **Exhibit B**).

23.     On information and belief, both before, and in response to the March 24, 2004 letter and other inquiries made by artists and their managers, the major record companies, including Defendant, fraudulently and unlawfully avowed that their contracts with Music Download and Mastertone Providers were sales agreements, and not license agreements. Because those agreements were not disclosed to artists, and were maintained in the highest confidential way, there was no way for artists like Plaintiff and her predecessor to know that the record companies, including Defendant, were deliberately misleading them, insofar as they knew that the agreements were in fact license agreements, and they were obligated to pay artists under the licensing provision of the agreements. Indeed, upon information and belief, this conspiracy among the record companies could not have been accomplished if any one label accounted for and paid licensed download royalties correctly. The actions of all major record companies, including Defendant, have affected potentially hundreds of thousands in the general public as a result.

24.     On information and belief, the major record labels, including Defendant, knew full well that the agreements between themselves and Music Download and Mastertone Providers were license agreements well before the March 24, 2004 letter, and tried to actually camouflage the agreements as sales agreements when such agreements were drafted. They did so for one reason: so

AMENDED COMPLAINT

11

they could fraudulently represent the agreements to be sale agreements when they knew they were not.

25. As a result of Defendant's and the other major record companies' fraudulent and deceitful practices, the California State Senate Select Committee on the Entertainment Industry, following an extended investigation and public hearing, cautioned the major record companies against engaging in policies and practices that constitute "purposeful neglect" of their royalty participants. (See: *California's Recording Industry Accounting Practices Act, SB 1034: New Auditing Rights for Artists*, 20 Berkeley Tech. L.J. 933 (2005), attached hereto as **Exhibit C**). The Committee found that the underpayment of royalties by record companies to recording artists involved issues of public concern which directly affect the public, and which California felt the need to protect by passing the Recording Industry Accounting Practices Act in 2004 (Cal. Civ. Code § 2501). As stated in a hearing of the California State Senate Select Committee on the Entertainment Industry by Senator Martha Escutia, "if public tax dollars are being spent to support artists who were cheated out of their royalty earnings, we need to shift the burden back to where it belongs: to the record companies that failed to pay the artists their rightful earnings." 20 Berkeley Tech. L.J. 933 at n. 66, citing Record Label Accounting Practices Hearing, *supra* note 10, at 1. The issue of

Defendant's "purposeful neglect" in the accounting of licensing income to its royalty participants is in part central here.

26. Defendant was notified on or before September 15, 2011, of its failure to properly pay members of "The Knack" royalties pursuant to the Recording Agreement. To date, Defendant has failed to remedy this failure and to make Plaintiff whole.

27. Upon information and belief, Defendant has continued to incorrectly account to and pay Plaintiff in the period after the specific written notice was sent to Defendant. Such continuing failure to account to and pay Plaintiff has resulted in additional substantial financial damage to Plaintiff.

## COUNT I

## **BREACH OF CONTRACT**

28. Plaintiff repeats and realleges each of the foregoing paragraphs as though fully set forth herein.

29. The members of the musical group "The Knack" and Defendant have a valid and enforceable contract, the Recording Agreement.

30. Plaintiff, as the legal representative of the estate of Bruce Gary and the owner of Bruce Gary's intellectual property, is a legal beneficiary of this contract. Therefore, Defendant is obligated to account to and pay Plaintiff royalties due to the estate of Bruce Gary under the Recording Agreement.

31. Defendant has failed to comply with the terms of the Recording Agreement by failing to account to and pay the members of "The Knack" fifty percent (50%) of Defendant's net receipts from the licensing of master recordings to Music Download and Mastertone Providers for the sale of permanent downloads, mastertones, and ringtones, among other things. Instead, through royalty statements sent to the members of "The Knack" every six months throughout the course of the Recording Agreement terms, Defendant represented to the members of "The Knack" that they were entitled to receive far less than the royalty rate actually due to them for the sale of permanent downloads, mastertones, and ringtones, among other things.

32. By reason of the foregoing and other acts not presently known by Plaintiff, Defendant has knowingly and materially breached its contractual obligations to Plaintiff under the Recording Agreement.

33. According to the terms of the Recording Agreement, the prevailing party to any action, suit or proceeding arising from or based upon the Recording Agreement is entitled to recover actual and reasonable attorneys' fees and costs.

34. Defendant's material breach of the Recording Agreement is the legal cause of substantial damage to Plaintiff for which Plaintiff seeks monetary damages in an amount to be determined at the time of trial, and after Defendant provides proper accounting.

AMENDED COMPLAINT

14

35. Further, Plaintiff seeks attorneys' fees and costs under the terms of the Recording Agreement and California Civil Code § 1717.

## COUNT II

## UNFAIR COMPETITION

36. Plaintiff repeats and realleges each of the foregoing paragraphs as though fully set forth herein.

37. California Business and Professions Code § 17200, *et seq.* prohibits any unlawful, unfair or fraudulent business acts or practices.

38. Defendant has violated the foregoing law by engaging in unlawful, unfair and fraudulent business practices. Defendant systematically and knowingly breached its contractual obligations with Plaintiff and others, and intentionally and fraudulently represented that the confidential agreements with Music Download and Mastertone Providers, were sales agreements when they knew they were licenses. The representations were known to be false when made, and were made deliberately to allow Defendant and the major record companies to pay artists and beneficiaries far less than they were entitled. This activity affected untold numbers of members of the public insofar as it potentially affected not only artists but their families, heirs, and beneficiaries.

39. Defendant has withheld from the musical group "The Knack" monies that were due to the members of "The Knack," and thus, to Plaintiff as a legal

AMENDED COMPLAINT

15

representative of the estate of Bruce Gary and the owner of Bruce Gary's intellectual property.  In doing so, Defendant knowingly breached its contractual obligations with Plaintiff.  Further, Defendant either knew, recklessly disregarded, or should have known that its collection income from Music Download and Mastertone Providers was in connection with a license agreement and the monies due Plaintiff from these licensees should have been accounted for and paid on that basis.  This is especially true given facts above, and the March 24, 2004 letter sent by leading entertainment attorneys to the Chairman and CEO of Defendant's parent company, David Munns, attesting to this very issue (see **Exhibit B**), and the guidance from California State Senate Select Committee on the Entertainment Industry, which cautioned the major record companies against engaging in policies and practices that constitute "purposeful neglect" of their royalty participants (see *California's Recording Industry Accounting Practices Act, SB 1034: New Auditing Rights for Artists*, 20 Berkeley Tech. L.J. 933 (2005), **Exhibit C**).

40.   Defendant misled Plaintiff by failing to disclose the unlawful nature of its conduct and employing such devices as are alleged above, as well as fraudulently and deceitfully representing its authority to collect and account for income from Music Download and Mastertone Providers on a basis other than as licensing income, particularly through royalty statements sent by Defendant to the members of The Knack every six months throughout the term of the Recording

Agreement. On information and belief, in each royalty statement, Defendant represented that Plaintiff and members of The Knack were to receive monies from income from Music Download and Mastertone Providers at a royalty rate of between 11.85 and 16.82 percent of the net receipts for such licenses, instead of the contractually agreed upon rate of fifty (50%) percent of the net receipts for such licensing income. (See results of audit conducted by the accounting firm Ames & Associates, submitted by Defendant Capitol through the Declaration of John Ray, DE 3 at Exhibit A-6).

41.      Defendant thus knowingly and fraudulently misled Plaintiff, members of "The Knack," other artists, and members of the public by failing to disclose the unlawful nature of its conduct and by employing such devices as alleged above, as well as affirmatively representing its authority to collect and account for income from Music Download and Mastertone Providers on a basis other than as non-disc record licensing income. Defendant record company's deceitful actions have had a direct impact on California citizens and have deprived Plaintiff of her rights under a California contract.

42.      This complaint is but one of several lawsuits filed in California seeking to redress similar conduct by record companies, including, but not limited to, the class action cases *James v. UMG Recordings*, 3:11-cv-01613, *Sledge et al. v. Warner Music Group Corp.*, 3:12-cv-00559, and *Williams et al. v. UMG*

AMENDED COMPLAINT

*Recordings,* 3:12-cv-01289, and cases involving individual plaintiffs, including, but not limited to, *F.B.T. Productions, LLC v. Aftermath Records et al.,* 2:08-cv-01563 and *Frampton v. A & M Records, Inc. et al.,* 2:11-cv-10649.

43. The gravity of the Defendant's misconduct outweighs any possible economic justification for such conduct – of which there is none.

44. The harm to Plaintiff, other artists, and the general public arising from Defendant's deceptive and unlawful practices outweighs the utility, if any, of those practices.

45. The conduct described herein is ongoing, continues to this date, and constitutes unfair and fraudulent business acts and practices within the meaning of the California Business & Professions Code.

46. Plaintiff is entitled to an Order requiring Defendant to cease its acts of unfair competition against both Plaintiff and the public at large.

47. Plaintiff is entitled to an Order enjoining Defendant from continuing to account for monies due Plaintiff from Music Download and Mastertone Providersin the unlawful manner in which Defendant has in the past and continue to account for said monies.

48. Plaintiff is entitled to restitution for quantifiable sums she had an ownership interest in and which Defendant unlawfully, unfairly or fraudulently failed to account for and pay to Plaintiff.

AMENDED COMPLAINT

18

49. Plaintiff is entitled to the payment of her attorneys' fees and costs under, among other provisions of law, California Code of Civil Procedure § 1021.5, or otherwise to the extent permitted by law.

## COUNT III

## ACCOUNTING

50. Plaintiff repeats and realleges each of the foregoing paragraphs as though fully set forth herein.

51. Plaintiff, due to the wrongful acts of Defendant, is entitled to a full accounting by Defendant of amounts relating to the royalties received under the Recording Agreement, whereby Plaintiff may determine the revenues and profits rightfully belonging to Plaintiff and wrongfully gained by Defendant.

## COUNT IV

## DECLARATORY JUDGMENT

52. Plaintiff repeats and realleges each of the foregoing paragraphs as though fully set forth herein.

53. Pursuant to California Code of Civil Procedure § 1060, this Court may declare the rights or duties, alone or with other relief; and the court may make a binding declaration of these rights or duties, whether or not further relief is or could be claimed at the time. Any such declaration shall have the force and effect of a final judgment.

54.     Plaintiff seeks a declaration that pursuant to the Recording Agreement, Defendant is obligated to pay "The Knack" fifty percent (50%) of Defendant's net receipts derived from the licensing of the Masters by Defendant to others for the manufacture and sale of phonograph records or for any other uses, including but not limited to the licensing of the Masters to Music Download Providers.

55.     Defendant continues to license the Masters to Music Download and Mastertone Providers and receive payment from Music Download Providers.

56.     By reason of the foregoing, there is a present controversy between Plaintiff and Defendant for which a declaratory judgment should be entered.

57.     Plaintiff has no adequate remedy at law.

## TRIAL BY JURY

58.     Plaintiff hereby requests trial by jury on all issues wherein trial by jury is permissible.

///

///

///

///

///

AMENDED COMPLAINT

# PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for judgment against Defendant as follows:

(1)     Compensatory damages, the exact amount to be determined at the time of trial, for Plaintiff's share of the withholding of royalties due to the members of "The Knack" under the Recording Agreement signed by "The Knack" and Defendant;

(2)     An Order and Judgment declaring that the Recording Agreement requires Defendant to account to and pay members of "The Knack" fifty (50%) of net receipts for licensing of the Masters including licensing to Music Download Providers;

(3)     Compensatory damages, the exact amount to be determined at the time of trial, for Plaintiff's share of the fifty percent (50%) of net receipts for licensing of the Masters including licensing to Music Download and Mastertone Providers due to the members of "The Knack" under the Recording Agreement;

(4)     Restitution for Defendant's Unfair Competition practices in an amount to be determined at trial;

(5)     An order requiring Defendant to submit to an accounting so that all gains, sales, profits, and advantages derived by Defendant from each of their acts may be determined;

AMENDED COMPLAINT

21

(6)     An award of actual and reasonable attorneys' fees and costs for services rendered Plaintiff in this action under the terms of the Recording Agreement and §§ 1717 and 1021.5 of the California Civil Code.

(7)     An award of pre- and post-judgment interest;

(8)     Plaintiff be awarded trial by jury on all issues triable by jury; and

(9)     Such other and further relief as the Court deems just and proper.


DATED:  August 1, 2012                    Respectfully submitted,

                                **KING & BALLOW**

                                By:   *Paul H. Duvall* 
                                      Paul H. Duvall, Esq.
                                      Richard S. Busch, Esq.
                                      Attorneys for Plaintiff

AMENDED COMPLAINT

22

# Exhibit  A

MJB:rls/2-12-79/3

Contract No. 6425

Los Angeles, California

Date: February 22, 1979
vaulted 2/22/79/r/s.

A-G-R-E-E-M-E-N-T

Capitol Records, Inc.
1750 North Vine Street
Hollywood, California 90028

Gentlemen:

The following when accepted by Capitol Records, Inc. (called "Capitol") will confirm our agreement this date as follows:

1. Capitol engages my exclusive personal services in connection with the production of records embodying my performances as a vocalist and/or instrumental musician for an initial period of 18 months ("initial period") as the same may be extended or renewed, commencing on the date hereof to record during the initial period at least the number of masters shown in the "Minimum No. of Masters" column in the Payment and Master Schedule below. Any additional masters shall require my consent. I accept such engagement and agree to render performances to the best of my ability. The words in Section 13. below shall have the respective meanings set forth therein when used in this agreement.

2. Conditioned upon my full and faithful performance of each and all of the material terms hereof, Capitol agrees, except as otherwise provided, to pay me the applicable amounts specified in the Payment and Master Schedule below. I grant Capitol two options, each to renew this agreement for that period specified beside each option period in the "Duration" column of the Payment and Master Schedule below, said option periods to run consecutively beginning at the expiration of the initial period and upon all the terms applicable to the initial period except as otherwise specified in this agreement. Each option may be exercised only by notifying me in writing at least 10 days prior to the expiration of the then current period.

INITIAL

Page -1- of 49 Pages

MJB:rls/2-12-79/3

PAYMENT AND MASTER SCHEDULE

| PERIODS OF THIS AGREEMENT | DURATION* | MINIMUM NO. OF MASTERS | AMOUNT PER MASTER | USA & CANADA | | | | OUTSIDE USA & CANADA ALL RECORI |
|---|---|---|---|---|---|---|---|---|
| | | | | BASE ROYALTIES | | SUGGESTED LIST PRICE | | |
| | | | | SINGLES | OTHER RECORDS | SINGLES | OTHER RECORDS | |
| Initial Period | 18 months | 2 lp-masters | *** | $.13** | $.68** | $1.29 | $7.98 | 10% |
| 1st Option Period | 18 months | 2 lp-masters | *** | $.13** | $.87** | $1.29 | $7.98 | 11% |
| 2nd Option Period | 24 months | 3 lp-masters | *** | $.13** | $.99** | $1.29 | $7.98 | 12% |

*Subject to Section 28. below
**As same may be increased or decreased pursuant to this Section 2.
***Applicable Union Scale

    a.  The applicable figure in the "Amount Per Master" column will be paid by Capitol as required by the applicable union regulations.

    b.  If a royalty is specified as to any period of this agreement:  (i) The applicable figure in the "Amount Per Master" column shall be deemed a nonreturnable advance recoverable from any royalties payable to me by Capitol under this agreement; (ii) Subject to Paragraph 35.c. hereinbelow, the royalties applicable to a given master shall be the royalties specified for the period in which the said master was delivered to Capitol; (iii) As to each master that I record hereunder jointly with another artist whose compensation for such recording is based on a royalty from Capitol and as to records that are manufactured therefrom, the applicable royalty rate under any other provision of this agreement shall be reduced 50%, and only 50% of the payments under Section 5. below in connection with the recording of such master shall be deducted from my royalties.  Any such joint recordings shall require my consent.



-2-

INITIAL

MJB:rls/1-22-79/2

c.  Capitol hereby guarantees me a minimum compensation of not less than $6,000.00 ("Minimum Compensation") for each 12 month period of the term of this agreement ("Period").  Any royalties, advances, union payments and/or any other amounts paid by Capitol to me during a particular Period shall be applied toward the Minimum Compensation otherwise payable to me.  If the California Code of Civil Procedure §526 and/or the California Civil Code §3423 is amended to provide that minimum compensation under an enforceable personal services contract theretofore entered into shall be a sum greater than $6,000.00 per annum, this Section 2.c. shall be deemed automatically amended to provide for annual compensation in the amount the amended law specifies.

d.  With respect to disc albums manufactured by Capitol from masters recorded hereunder and sold in the USA or manufactured by Capitol's Canadian subsidiary ("Capitol-Canada") from masters recorded hereunder and sold in Canada and on singles therefrom, the royalty payable shall be the applicable royalty shown in the "Base Royalty" column of the Payment and Master Schedule hereinabove; provided that the royalty [as such royalty may be escalated pursuant to Paragraphs 2.e.(i), 2.e.(ii), and 2.e.(iii)] with respect to any record with a suggested retail price greater or lesser than is correspondingly indicated in the "Suggested List Price" column of the Payment and Master Schedule shall be proportionately increased or decreased in direct proportion as the applicable "Base Royalty" is to the applicable "Suggested List Price" shown in the Payment and Master Schedule.  For example, (a) if the suggested retail price of a disc album in the USA is $8.98, the applicable royalty shall be computed by the following formula:

$$\frac{.68}{7.98} = \frac{x}{8.98}$$

where x equals the royalty applicable to the $8.98 album; or (b) if the suggested retail price of a single in the USA is $1.49, the applicable royalty shall be computed by the following formula:

$$\frac{.13}{1.29} = \frac{x}{1.49}$$

where x equals the royalty applicable to the $1.49 single.

e.  With respect to disc albums manufactured by Capitol from masters recorded hereunder and sold in the USA or manufactured by Capitol-Canada from masters recorded hereunder and sold in Canada:

-3-

INITIAL

MJB:rls/1-22-79/2

(i) Notwithstanding anything to the contrary contained in the Payment and Master Schedule, with respect to sales of each disc-type album manufactured from the first lp-master recorded hereunder in the initial period and sold by Capitol in the USA and sold by Capitol-Canada in Canada [other than sales (1) through a club distribution plan, (2) of budget line records, (3) of premium records, (4) to military post exchanges, and/or (5) to wholesalers in the USA*solely for export to customers outside the USA] the USA and Canadian base royalties to be computed and paid pursuant to the terms hereof shall be as follows:

A.   For such net USA sales up to 500,000 units of such disc-type album and its tape record equivalent, and for sales by Capitol-Canada of the applicable disc-type album and its tape record equivalent from release to the last day of the month that the particular album achieved net USA sales of 500,000 copies:

|  | Base Royalty | Suggested List Price |
|---|---|---|
| USA | $.68 U.S. | $7.98 U.S. |
| Canada | $.68 Canadian | $7.98 Canadian |

B.   For such net USA sales from 500,001 units to 750,000 units of such disc-type album and its tape record equivalent, and for sales by Capitol-Canada of the applicable disc-type album and its tape record equivalent which are sold after the last day of the month the particular album achieved net USA sales of 500,000 copies to the last day of the month the particular album achieved net USA sales of 750,000 copies:

|  | Base Royalty | Suggested List Price |
|---|---|---|
| USA | $.74 U.S. | $7.98 U.S. |
| Canada | $.74 Canadian | $7.98 Canadian |

C.   For such net USA sales from 750,001 units to 1,000,000 units of such disc-type album and its tape record equivalent, and for sales by Capitol-Canada of the applicable disc-type album and its tape record equivalent which are sold after the last day of the month the particular album achieved net USA sales of 750,000 copies to the last day of the month the particular album achieved net USA sales of 1,000,000 copies:

|  | Base Royalty | Suggested List Price |
|---|---|---|
| USA | $.81 U.S. | $7.98 U.S. |
| Canada | $.81 Canadian | $7.98 Canadian |

*and Canada

-4-

INITIAL

MJB:rls/1-22-79/2

D.  For such net USA sales from 1,000,001 units to 1,500,000 units of such disc-type album and its tape record equivalent, and for sales by Capitol-Canada of the applicable disc-type album and its tape record equivalent which are sold after the last day of the month the particular album achieved net USA sales of 1,000,000 copies to the last day of the month the particular album achieved net USA sales of 1,500,000 copies:

|        | Base Royalty   | Suggested List Price |
|--------|----------------|----------------------|
| USA    | $.87 U.S.      | $7.98 U.S.           |
| Canada | $.87 Canadian  | $7.98 Canadian       |

E.  For such net USA sales in excess of 1,500,000 units of such disc-type album and its tape record equivalent, and for sales by Capitol-Canada of the applicable disc-type album and its tape record equivalent which are sold after the last day of the month the particular album achieved net USA sales of 1,500,000 copies:

|        | Base Royalty   | Suggested List Price |
|--------|----------------|----------------------|
| USA    | $.93 U.S.      | $7.98 U.S.           |
| Canada | $.93 Canadian  | $7.98 Canadian       |

(ii)  Notwithstanding anything to the contrary contained in the Payment and Master Schedule, with respect to sales of each disc-type album manufactured from the second lp-master and any subsequent lp-master recorded hereunder in the initial period and sold by Capitol in the USA and sold by Capitol-Canada in Canada [other than sales (1) through a club distribution plan, (2) of budget line records, (3) of premium records, (4) to military post exchanges, and/or (5) to whole-salers in the USA*solely for export to customers outside the USA*] the USA and Canadian base royalties to be computed and paid pursuant to the terms hereof shall be as follows:

A.  For such net USA sales up to 250,000 units of such disc-type album and its tape record equivalent, and for sales by Capitol-Canada of the applicable disc-type album and its tape record equivalent from release to the last day of the month that the particular album achieved net USA sales of 250,000 copies:

|        | Base Royalty   | Suggested List Price |
|--------|----------------|----------------------|
| USA    | $.68 U.S.      | $7.98 U.S.           |
| Canada | $.68 Canadian  | $7.98 Canadian       |

*and Canada

-5-

INITIAL

B.   For such net USA sales from 250,001 units to 500,000 units of such disc-type album and its tape record equivalent, and for sales by Capitol-Canada of the applicable disc-type album and its tape record equivalent which are sold after the last day of the month the particular album achieved net USA sales of 250,000 copies to the last day of the month the particular album achieved net USA sales of 500,000 copies:

|  | Base Royalty | Suggested List Price |
|---|---|---|
| USA | $.74 U.S. | $7.98 U.S. |
| Canada | $.74 Canadian | $7.98 Canadian |

C.   For such net USA sales from 500,001 units to 750,000 units of such disc-type album and its tape record equivalent, and for sales by Capitol-Canada of the applicable disc-type album and its tape record equivalent which are sold after the last day of the month the particular album achieved net USA sales of 500,000 copies to the last day of the month the particular album achieved net USA sales of 750,000 copies:

|  | Base Royalty | Suggested List Price |
|---|---|---|
| USA | $.81 U.S. | $7.98 U.S. |
| Canada | $.81 Canada | $7.98 Canadian |

D.   For such net USA sales from 750,001 units to 1,500,000 units of such disc-type album and its tape record equivalent, and for sales by Capitol-Canada of the applicable disc-type album and its tape record equivalent which are sold after the last day of the month the particular album achieved net USA sales of 750,000 copies to the last day of the month the particular album achieved net USA sales of 1,500,000 copies:

|  | Base Royalty | Suggested List Price |
|---|---|---|
| USA | $.87 U.S. | $7.98 U.S. |
| Canada | $.87 Canadian | $7.98 Canadian |

E.   For such net USA sales in excess of 1,500,000 units of such disc-type album and its tape record equivalent, and for sales by Capitol-Canada of the applicable disc-type album and its tape record equivalent which are sold after the last day of the month the particular album achieved net USA sales of 1,500,000 copies:

|  | Base Royalty | Suggested List Price |
|---|---|---|
| USA | $.93 U.S. | $7.98 U.S. |
| Canada | $.93 Canadian | $7.98 Canadian |

INITIAL

MJB:rls/1-22-79/2

   (iii) Notwithstanding anything to the contrary
contained in the Payment and Master Schedule, with respect
to sales of each disc-type album manufactured from masters
recorded hereunder during the first option period hereunder
and sold by Capitol in the USA and sold by Capitol-Canada
in Canada [other than sales (1) through a club distribution
plan, (2) of budget line records, (3) of premium records,
(4) to military post exchanges, and/or (5) to wholesalers
in the USA*solely for export to customers outside the USA]
the USA and Canadian base royalties to be computed and paid
pursuant to the terms hereof shall be as follows:

   A.  For such net USA sales up to 250,000
units of such disc-type album and its tape record equivalent,
and for sales by Capitol-Canada of the applicable disc-type
album and its tape record equivalent from release to the
last day of the month that the particular album achieved net
USA sales of 250,000 copies:

|        | Base Royalty    | Suggested List Price |
|--------|-----------------|----------------------|
| USA    | $.87 U.S.       | $7.98 U.S.           |
| Canada | $.87 Canadian   | $7.98 Canadian       |

   B.  For such net USA sales from 250,001
units to 500,000 units of such disc-type album and its tape
record equivalent, and for sales by Capitol-Canada of the
applicable disc-type album and its tape record equivalent
which are sold after the last day of the month the particular
album achieved net USA sales of 250,000 copies to the last
day of the month the particular album achieved net USA sales
of 500,000 copies:

|        | Base Royalty    | Suggested List Price |
|--------|-----------------|----------------------|
| USA    | $.93 U.S.       | $7.98 U.S.           |
| Canada | $.93 Canadian   | $7.98 Canadian       |

   C.  For such net USA sales in excess of
500,000 units of such disc-type album and its tape record
equivalent, and for sales by Capitol-Canada of the applicable
disc-type album and its tape record equivalent which are sold
after the last day of the month the particular album achieved
net USA sales of 500,000 copies:

|        | Base Royalty    | Suggested List Price |
|--------|-----------------|----------------------|
| USA    | $.99 U.S.       | $7.98 U.S.           |
| Canada | $.99 Canadian   | $7.98 Canadian       |

*and Canada

INITIAL

Exhibit A -030

MJB:rls/1-22-79/2

(iv) Notwithstanding anything to the contrary contained in the Payment and Master Schedule, with respect to sales of each disc-type album manufactured from masters recorded hereunder during the second option period hereunder and sold by Capitol in the USA and sold by Capitol-Canada in Canada [other than sales (1) through a club distribution plan, (2) of budget line records, (3) of premium records, (4) to military post exchanges, and/or (5) to wholesalers in the USA*solely for export to customers outside the USA] the USA and Canadian base royalties to be computed and paid pursuant to the terms hereof shall be as follows:

For net sales of all units of such disc-type album and its tape record equivalent:

|  | Base Royalty | Suggested List Price |
|---|---|---|
| USA | $.99 U.S. | $7.98 U.S. |
| Canada | $.99 Canadian | $7.98 Canadian |

f. With respect to the sale of records to or for military post exchanges, if any such sales are at prices lower than Capitol's (or Capitol-Canada's) usual dealer price for that category of records, the royalty payable to me here-under shall be reduced proportionately.



*and Canada

—8—

INITIAL

MJB:rls/1-22-79/2

g. Except as may be provided to the contrary herein, royalties for premium records shall be 7.2%, based on Capitol's (or Capitol-Canada's) price to the advertiser or sponsor.

h. As to records sold by licensees of Capitol-Canada, royalties applicable to such records will be computed and paid on the same basis and in the same manner as the fees to Capitol-Canada are computed, less taxes included in the price of the record and less an allowance for the "container" charge charged to Capitol-Canada by the applicable licensee with respect to the applicable record, provided I shall not be charged with a greater container deduction than the container deduction charged to Capitol-Canada by the applicable licensee. All royalties applicable to records manufactured and sold hereunder by Capitol-Canada shall be paid at the then prevailing rate of exchange in effect when the applicable accounting statement is due and shall be in the national currency of the USA; all other royalties applicable to this agreement received from Canada shall be computed in the national currency of Canada and shall be paid at the same rate of exchange as Capitol is paid.

i. With respect to records manufactured under this agreement and sold outside the USA and Canada: (i) Royalties will be based on the list price per record (less excise and other applicable taxes included in the price of the record) for retail sales in the country of manufacture or the country of sale (depending upon the basis upon which Capitol was paid), or upon the price to the advertiser or sponsor in the case of records sold and/or distributed as premiums. (ii) Except as provided in Section 2.k. below, only records for which payment is received by Capitol in the USA or credited to Capitol's account shall be deemed sold. (iii) All royalties will be computed in the national currency of the country to which the list price so elected applies and will be paid at the same rate of exchange as Capitol is paid. Except as may be specifically provided to the contrary herein, all royalties will be based on 100% of records sold (less returns) by Capitol's licensees or by licensees of such licensees. All royalties applicable to this agreement received from foreign sources shall be subject

INITIAL

-9-

MJB:rls/1-22-79/2

to its applicable share of any applicable taxes. (iv) Roy-alties on records packaged in jackets, in boxes, on reels, in cartridges, or in or on similar "containers" shall be computed on the suggested retail list price less an allowance for the "container" computed in accordance with the standard accounting practices of Capitol's licensees, as Capitol is accounted to, provided I shall not be charged with a greater container deduction than the container deduction charged to Capitol by the applicable licensee, and provided further in no event shall such container deduction charged to me exceed the following percentage of the suggested retail sales price: 6-1/2% for a "single fold" jacket containing one 12-inch disc-type long-playing record; 10% for a "double fold" jacket or box containing one or more 12-inch long-playing records; 17% for a tape record container; and 4% for a special decorative sleeve or jacket containing one or more extended play records. (v) Royalties applicable to records sold under special merchandising plans or otherwise (which records are sold to distributors, subdistributors and/or dealers in lieu of giving free records) at less than the regular wholesale price applicable to the initial release of the records and/or applicable to records of that type in the record industry shall be reduced in the same proportion as the regular wholesale price was reduced on such sales.

j. (i) All royalties will be computed and paid upon the aggregate number of records sold, for which Capitol has been paid or credited, in each applicable royalty cate-gory after deducting returns, rebates and credits on records returned in each royalty category or, and only if Capitol is so accounted to by the relevant licensee, a flat 10% of the gross royalties with respect to Japan, Columbia, Peru, and Nigeria will be deducted and a flat 5% of the gross roy-alties with respect to Jamaica will be deducted provided if Capitol is accounted to on a more favorable basis than it is now accounted to by the licensees in the above countries specified in this Section 2.j.(i), I shall receive my applic-able pro rata share of the benefit of such accounting which is more favorable to Capitol. With respect to record returns, rebates and/or credits, credit in accordance with Capitol's then standard accounting practice shall be given for records which were shipped on a "no charge" basis or pursuant to Section 2.i.(v) above. (ii) Capitol shall be entitled to withhold from U.S., and, if Capitol is so accounted to, from Canadian and licensee payments otherwise due from time to time reasonable reserves against anticipated returns, rebates and credits; provided such reserves shall not be withheld longer than three full accounting periods following the accounting period during which such reserves were first with-held; and further provided that (1) in the initial period

-10-

INITIAL

MJB:rls/2-12-79/3

hereof Capitol shall consult in good faith with me if
Capitol desires to withhold from the aforesaid payments
otherwise due me, reserves in excess of 50% of my royalties
with respect to gross sales of singles (without deducting
returns) during any applicable accounting period and/or 30%
of my royalties with respect to gross sales of albums (with-
out deducting returns) during any applicable accounting
period; and (2) in each option period hereof, Capitol shall
not withhold from the aforesaid payments otherwise due me
reserves in excess of 50% of my royalties with respect to
gross sales of singles (without deducting returns) during
any applicable accounting period and 30% of my royalties
with respect to gross sales of albums (without deducting
returns) during any applicable accounting period.  (iii) The
base royalty applicable to budget line records and to records
sold through a club distribution plan shall be 50% of the
otherwise applicable royalty computed as specified in Section
2.  (iv) No royalties will be payable on:  (1) records given
away or furnished on a "no charge" basis for promotional
purposes, and which are punched or clearly marked as promo-
tional, to disc jockeys, radio and television stations, net-
works or others including but not limited to those records
given to me as specified in Section 45. hereinbelow, (2) sub-
ject to Section 41. hereinbelow, records given away, dis-
tributed or invoiced on a "no charge" basis as a sales in-
ducement to independent distributors, subdistributors,
dealers, or others; (3) records licensed or distributed
for airline or other transportation use, unless Capitol is
paid therefor, in which case I shall be entitled to one-half
of Capitol's net receipts derived therefrom.  (v) No royal-
ties will be paid on sales of records deleted from Capitol's
catalog made by Capitol to anyone at prices 50% or more below
the otherwise regular price to subdistributors (close-out
sales).  (vi) With respect to any use of masters recorded
hereunder (including but not limited to uses in club dis-
tribution plans, "key outlet marketing" plans, and budget
line sales) by a licensee of Capitol or a licensee of Capitol-
Canada, whether for the manufacture of records or otherwise
and regardless of whether fees to Capitol are based on a
"flat fee" or "cent rate" basis or, in the U.S.A. and Canada on
a percentage basis, then in lieu of any other royalty specified
in this agreement Capitol shall pay me 50% of Capitol's net re-
ceipts from such licensee with respect to such use of the appli-
cable masters, computed on the same quantity, basis and in the
same manner as Capitol is paid.  (vii) As used in this Subpara-
graph j. Item (vi) above, the words "net receipts" shall mean
Capitol's gross receipts for the license of the masters, less any
sums included therein that Capitol is obligated to pay to bona
fide third parties, including, but not limited to, sums payable
to persons who contributed to the recording of the masters

-11-

INITIAL

MJB:rls/2-12-79/3

(with the exception of payments to individual producers which payments to individual producers shall be deducted from my share of net receipts hereunder), sums payable to the Phonograph Record Manufacturers Special Payment Fund, pursuant to the Phonograph Record Trust Agreement, the AFTRA Pension and Welfare Fund, the AFTRA Contingent Scale Payments and any similar fund now or hereafter created by reason of a collective bargaining agreement, and/or payments to or for the copyright owner of the musical selections or other copyrighted material embodied in the masters. (viii) Capitol will compute all royalties within 60 days after the first day of March and September of each year (or such other semi-annual payment days as Capitol may adopt) for the preceding six month period and will pay such royalties within such 60 day period less any unrecouped advances and/or other recoupable amounts made to or incurred by me hereunder during or prior to the accounting period in question. If Capitol changes the foregoing computation and payment dates, I will in no event be accounted to, and, if applicable, paid royalties later than six months after the last day the preceding payment and/or computation, as the case may be, was required to be made to me by Capitol.

k. If royalties are not paid to Capitol by a licensee because the currency of the relevant country is "blocked," Capitol shall elect to accept payment of royalties in the currency of such country, in which case Capitol will deposit to my credit (and at my expense) in such foreign currency in a depository selected by me any payments so received as royalties applicable to this agreement and will notify me thereof promptly. Deposit in accordance with the foregoing shall fulfill Capitol's obligations under this agreement as to record sales to which such royalty payments are applicable.

l. At any time within three years after any royalty statement is rendered to me hereunder, I shall have the right to give Capitol written notice of my intention to examine Capitol's books and records with respect to such statement. Such examination shall be commenced at a mutually convenient time and conducted at my sole cost and expense, by an independent certified public accountant designated by me. Such examination shall be made during Capitol's usual business hours at the place where Capitol maintains the books and records which relate to me and which are necessary to verify the accuracy of the statement or statements specified in my notice to Capitol, and my examination shall be limited to the foregoing. My sole right to inspect Capitol's books and records and to make extracts and copies thereof at my expense shall be as set forth in this subparagraph, and Capitol shall have no

-12-

INITIAL

Exhibit A -035

MJB:rls/1-22-79/2

obligation to produce such books and records in connection with more than one audit with respect to each statement rendered to me. Unless notice shall have been given to Capitol as provided in this subparagraph, each royalty statement rendered to me shall be final, conclusive and binding on me and shall constitute an account stated. I shall be foreclosed from maintaining any action, claim or proceeding against Capitol in any forum or tribunal with respect to any statement or accounting due hereunder unless such action, claim or proceeding is commenced against Capitol in a court of competent jurisdiction within four years after the date such statement or accounting is rendered.

m.   To determine the royalty applicable to a given master the specified percent royalty rate (or the specified royalty in cents) shall be applied against that portion (to the nearest cent) of the royalty computation price of a given record which the playing time of the selection embodied in such master bears to the aggregate of the playing times of all selections of the said record. For the purpose of this Paragraph 2.m. a selection having a playing time not exceeding 5 minutes 30 seconds shall be deemed to have a playing time of 5 minutes; a selection having a playing time exceeding 5 minutes 30 seconds, but not exceeding 10 minutes 30 seconds, shall be deemed to have a playing time of 10 minutes; and so on in intervals of 5 minutes.

n.   Notwithstanding anything to the contrary contained in this Section 2., with respect to tape records sold, the base royalty applicable to each tape record shall be the rate which, when applied to the royalty computation price for such tape record, will result in the same royalties payable for each equivalent disc record when computed at the royalty specified in this Section 2.; provided, the base royalty applicable to each tape record without an equivalent disc record shall be 100% of the royalty specified in this Section 2. which would have been applicable to an equivalent disc record with a suggested retail list price equal to the suggested retail list price of such tape record.

3.   Capitol may recover from all royalties payable to me hereunder all costs which at my request are actually incurred or paid by Capitol or reimbursed to me by Capitol in connection with tours, personal appearances, television appearances or other performances by me including, but not limited to, agency fees, costs of transportation, costs of accomodations, instrument rental, costumes, and costs of photography and artwork and other costs related to such appearances. Nothing contained in this Section 3. shall be interpreted as requiring Capitol to incur or reimburse me for any of the foregoing costs.

-13-

INITIAL

Exhibit A -036

MJB:rls/2-12-79/3

4. a. During the term of this agreement including all renewals, extensions, days of suspension, and all periods added by amendments or by other agreements: I will not perform for the purpose of or myself engage in making records for anyone other than Capitol; I will not authorize the use of my name, likeness or other identification for the purpose of distributing, selling, advertising or exploiting records for any person other than Capitol. I will not perform any selection embodied in a master delivered to Capitol hereunder for the purpose of making records (other than permitted recordings) for any person other than Capitol (i) for three consecutive years after the date of expiration or other termination of this agreement, or (ii) for four consecutive years after the delivery to Capitol of the applicable master, whichever is later.

b. Notwithstanding anything to the contrary contained in Paragraph 4.a. hereinabove, at any time six months after a particular record embodying masters recorded hereunder has been deleted by Capitol from its catalog ("Deleted Record") I may notify Capitol in writing of my desire to have the rerecording restriction waived in connection with any selection(s) contained in such Deleted Record, and Capitol agrees to waive such rerecording restriction if (i) Capitol has not rereleased the particular Deleted Record within three months following the date Capitol received my aforesaid notice pursuant to this Paragraph 4.b.; and (ii) Capitol has recouped all of its unrecouped amounts hereunder by the end of the three months specified in Item (i) above; and (iii) the selection(s) with respect to which I desire Capitol to waive the rerecording restriction does not appear in any other of my record(s) contained in Capitol's catalog (including "Best of" or "Live" albums) as of the end of the three month period specified in Item (i) above.

5. a. Subject to those terms and conditions of this agreement expressly to the contrary, I acknowledge that Capitol is the sole, exclusive and perpetual owner of all the results and proceeds of all my services under this agreement, including all masters from inception, which ownership entitles Capitol, among other things, to:

-14-

INITIAL

MJB:rls/1-22-79/2

(i) The exclusive and perpetual (1) owner-ship of all duplicates of the masters and records manufac-tured therefrom; (2) right to control and use the same and the performances embodied therein upon such terms and in such forms as in its sole discretion Capitol may approve, subject to the terms and conditons hereof; (3) right to manufacture, advertise, sell, lease, license or otherwise use or dispose of such records or any part thereof, or to refrain from so doing, in all fields of use throughout the world and upon such terms as, in its sole discretion, Capitol may approve; and (4) right to perform publicly such records in any medium by any means whatsoever.

(ii) In connection with records made or ob-tained hereunder, the perpetual right to use and publish and to permit others to use and publish my name (including any professional name heretofore or hereafter adopted by me), signature, likeness, voice and sound effects, and bio-graphical material concerning me for advertising and trade purposes in connection with records hereunder and the record business of Capitol, and the right during the term of this agreement to use as descriptive of me an appellation like "Capitol Exclusive Artist", or to refrain therefrom. Not-withstanding the foregoing, Capitol shall not have the right to utilize my name in connection with any endorsements or any other purposes unrelated to my records hereunder or the record business of Capitol.

INITIAL

-14a-

(iii) The perpetual right to release records manufactured from the masters under the name of "Capitol" or such other trade name or mark as Capitol may elect, provided, during the term of this agreement the initial release in the USA of records manufactured from any masters recorded hereunder shall be under the name of "Capitol".

(iv) The perpetual right to release records manufactured from masters and positives or negatives thereof which records may include performances of other artists, and to sell the records in albums, which albums may contain pictures, prose and verse and records embodying performances of other artists, or to refrain therefrom; provided, during the term and for a period of one year thereafter, in the absence of my written consent, Capitol and its licensees may not use the masters in the manufacture of records on which performances by other artists are coupled except in the case of records licensed or distributed for airline or other transportation use.

(v) All rights in the "sound recording" copyrights hereunder, and I acknowledge and agree that each master recorded hereunder embodying the results and proceeds of my services (i) is prepared within the scope of Capitol's engagement of my exclusive personal services and is a work made for hire, or (ii) as part of an lp-master constitutes a work specially ordered by Capitol for use as a contribution to a collective work and shall be considered a work made for hire. I further acknowledge that Capitol is the exclusive owner of copyright with respect to each such master and any "sound recording" or "phonorecord" or "copy" manufactured therefrom, and that Capitol has the right to exercise all rights of the copyright proprietor with respect thereto, including, but not limited to, all exclusive rights specified in 17 U.S.C. §106 and the exclusive right to register copyright in the name of Capitol.

(vi) The right to license others to exercise any and all rights possessed by Capitol under this agreement, throughout the world, upon such terms as Capitol may approve.

b. Notwithstanding the provisions of Section 5.a.(v) above, I agree that to the extent, if any, that I may be deemed an "author" of any master, or of any "sound recording" or "phonorecord" or "copy" manufactured from a master recorded under this agreement, I grant and assign to Capitol exclusive rights of copyright in and to such

INITIAL

MJB:rls/2-12-79/3

master and any "sound recording," "phonorecord" or "copy" manufactured therefrom, including, but not limited to, all exclusive rights specified in 17 U.S.C. §106. I agree to execute and deliver to Capitol and I grant to Capitol a declaration of employment and power of attorney irrevocable and coupled with an interest in the form of Exhibit "B" hereto to execute for me and in my name all documents and instruments necessary or desirable to effectuate the intents and purposes of this Paragraph 5.b. and to accomplish, evidence and perfect the rights granted to Capitol pursuant to this Paragraph 5.b., including, but not limited to, documents to apply for and obtain all registration of copyrights in and to any such master, "sound recording," "phonorecord" or "copy" and documents to assign such copyrights to Capitol.

6.    a.    I agree that in connection with each record manufactured from masters recorded hereunder and with respect to any "Best of" or repackaged albums embodying the performances of me released hereunder I shall grant or cause the USA publisher to grant to Capitol a mechanical license for the USA and Canada for each selection at the statutory rate current at the time of licensing for each (i) record sold at Capitol's invoiced price and not returned, and/or (ii) album invoiced or otherwise distributed as a sales inducement free good, and not returned; provided in no event shall the combined rates for all selections in an album manufactured from one lp-master be less than 10 times the statutory rate for a musical composition with a five minute playing time current at the time of licensing or greater than 11 times the statutory rate for a musical composition with a five minute playing time current at the time of licensing. Further, the combined minimum and maximum mechanical license royalty rates for all selections in an album manufactured from two lp-masters shall be increased in direct proportion as the retail list price for such album manufactured from two lp-masters bears to the then current suggested list price for the immediately preceding album released hereunder manufactured from one lp-master. If the minimum mechanical fees pursuant to this Paragraph 6.a. for a particular album hereunder exceed the total mechanical fees actually payable to publishers for selections on said album ("Mechanical Fee Excess"), the Mechanical Fee Excess shall be included for all purposes in my royalty account hereunder. In no event shall the combined rates for all selections in a single record exceed two times the statutory rate for a musical composition with a five minute playing time current at the time of licensing for each single sold at Capitol's invoiced price and not returned.

INITIAL

-16-

MJB:rls/2-12-79/3

b.   I agree to indemnify and hold Capitol harm-
less from rates in excess of the applicable amounts speci-
fied in Paragraph 6.a. above.  If Capitol pays any such
excess, such payments shall be a direct debt from me to
Capitol which, in addition to any other remedies available,
Capitol may recover from royalties or any other payments
to be made by Capitol to me.

7.   I represent and warrant that I am not a party
to any contract which prevents my fulfilling all of my ob-
ligations hereunder or which impairs any rights granted to
Capitol hereunder, and I agree that all contracts executed
by me during any period of this agreement will be subject
to the provisions of this agreement and that Capitol shall
have first call upon my endeavors.  I agree that during the
term I will work diligently at and pursue my career as a
record artist and as an entertainer.

8.   I represent and warrant that I am under no dis-
ability, restriction, or prohibition respecting musical
works that I can record for Capitol except to the extent,
if any, set forth in the Schedule of Restricted Musical
Works attached hereto.

9.   I acknowledge that my performances hereunder are
of a special, unique, unusual, extraordinary and intellec-
tual character which gives them peculiar value, the loss of
which cannot be reasonably or adequately compensated in
damages in an action at law and that a breach by me of any
of the provisions of this agreement will cause Capitol
irreparable injury.  I expressly agree that Capitol is
entitled to seek injunctive and other equitable relief to
prevent a breach of this agreement or any portions thereof,
which relief shall be in addition to any other rights or
remedies, for damages or otherwise, which Capitol may have.

10.   a.   Subject to Paragraph 10.b. hereinbelow, if
my voice should be medically determined to be materially
and permanently impaired, or if I should fail, refuse or
neglect to comply with any of my other material obligations
hereunder, Capitol, in addition to any other rights or
remedies which it may have, may elect to terminate my en-
gagement hereunder by notice in writing and thereby be re-
lieved of any liability in connection with unrecorded masters.

b.   Notwithstanding anything to the contrary
contained in Paragraph 10.a. hereinabove, Capitol shall not
have the right to terminate this agreement except as follows:

(i) If, after receipt from Capitol of written
notice that a particular lp-master is due and of Capitol's
intention to terminate for my failure to timely deliver same,

-17-

INITIAL

MJB:rls/2-12-79/3

I fail to deliver any lp-master within four months (or six months if such failure is due to a force majeure event) after it is due in an applicable period of the term pursuant to Section 28. hereinbelow, or four months (or six months as applicable) after the receipt of such notice (whichever is later); or

(ii) For all other reasons not covered by Subparagraph 10.b.(i), Capitol shall first notify me in writing of my default hereunder, and I shall thereafter have 30 days in which to cure said default.

11. No termination of this agreement (whether by me or by Capitol) shall in any way limit or curtail any of Capitol's rights, title, interest or privileges to or in connection with any of the results and proceeds of my endeavors under this agreement or any rights or privileges which continue after the term of this agreement ends.

12. a. If at any time during the term hereof by reason of any act of God, fire, earthquake, flood, explosion, strike, labor disturbance, civil commotion, act of Government, its agencies or officers, any order, regulation, ruling or action of any labor union or association of artists, musicians, composers or employees affecting Capitol, its subsidiaries or affiliates or the industry in which it is or they are engaged or any shortage of or failure or delays in the delivery of materials, supplies, labor or equipment, or any other cause or causes beyond the control of Capitol, any affiliate or subsidiary, whether of the same or any other nature: (i) the enjoyment by Capitol, its subsidiaries or affiliates of any rights, privileges or benefits hereunder, including, without limitation, the recording of masters or the manufacture, sale or distribution of records, is materially delayed, hampered, interrupted or interfered with, or otherwise becomes impossible or impracticable; or (ii) the performance of Capitol's obligations hereunder is delayed, hampered, interrupted or interfered with, or otherwise becomes impossible or impracticable, then Capitol may upon notice to me suspend the delivery of all lp-masters due to be delivered and by doing so, the term of this agreement shall be suspended for the duration of any such contingency. The duration of the suspension shall be equal to the total of all such days of suspension and the delivery of all lp-masters shall be postponed accordingly. If Capitol's ability to pay is not affected, Capitol shall continue to pay royalties due hereunder during such suspension.

b. Notwithstanding anything to the contrary contained in Section 12.a. above, if any suspension thereunder (i) does not affect most of the major companies in the

-18-

INITIAL

MJB:rls/2-12-79/3

industry in which Capitol is engaged and (ii) continues for more than six consecutive months, then I may elect to terminate this agreement by notice to Capitol, which termination: (A) shall be effective on midnight of the tenth day after such notice is given if during such 10 day period said suspension is not discontinued by Capitol, or (B) shall not be effective if during such 10 day period Capitol discontinues such suspension.

13. Definitions:

a. The word "person" means a person, firm, association or corporation.

b. The word "selection" means a single musical work (including a medley), story, poem, or similar work, irrespective of length.

c. The word "master" means any original recording not theretofore recorded by me which is acceptable to Capitol in the exercise of its reasonable judgment as satisfactory for the manufacture and sale of records and which embodies a performance by me of a selection approved by Capitol in the exercise of its reasonable judgment. Each selection shall be submitted by Doug Fieger ("Fieger") or his designee, to Capitol's Vice-President of A & R prior to the recording thereof for approval by Capitol. The word "master" includes the original recording and all derivatives therefrom, including, without limitation, mix-down tapes and lacquer masters produced therefrom.

d. The noun "record" means any device by which sound may be recorded for later transmission to listeners, whether now known or unknown and howsoever used, whether embodying sound alone or synchronized with or accompanied by visual images of me or another subject. The noun "record" does not include a "master" as defined above or a "permitted recording" as defined below.

e. The word "lp-disc" means a 12-inch, 33-1/3 rpm, long-playing disc-type record.

f. The words "tape record" mean a record recorded on magnetic tape, whether reel-to-reel, continuous loop, or otherwise.

g. The word "album" means one or more lp-discs embodying more than one selection on each side and released in one package, or the tape record equivalent thereof.

h. The word "lp-master" means a set of masters sufficient to constitute a disc-type album with a playing time of not less than 30 minutes.

-19-

INITIAL

MJB:rls/2-12-79/3

i.  The words "budget line records" mean records for which the retail list price is two-thirds or less of Capitol's usual price for purposes of computing distributor discounts for that category of record.

j.  The words "club distribution plan" mean distribution by mail order direct to consumers.

k.  The words "permitted recording" mean (i) sound-tracks for motion pictures, (ii) recordings for broadcasts of radio programs and television programs, and (iii) library service electrical trasncriptions other than those which embody a selection recorded for Capitol as to which the restrictive period has not expired.

l.  The letters "USA" mean the United States of America, its territories and possessions.

m.  The words "single record" mean a disc-type record, regardless of size or playing speed embodying not more than one selection on each side, or the tape record equivalent thereof.

14.  Masters shall not be deemed to be finished, completed or delivered hereunder until such time as fully equalized, edited two-track stereophonic tape copies of such masters ready for the manufacture of final lacquer masters along with fully-proofed final reference discs of such masters as well as all elements necessary for Capitol to have complete "label copy" information with respect to such masters including, without limitation, the title of each selection embodied on the masters, the timing of each such selection and the publisher(s) of each such selection, as well as any other information that is to appear on labels and/or liners of records hereunder have been delivered to an authorized employee of Capitol at the address for purposes of serving notices on Capitol.

15.  My right to make any "permitted recording" does not include the right to authorize any person other than Capitol to use such permitted recording or any component thereof for the purposes of manufacturing, distributing, selling, advertising, or exploiting records for home use either during the term of this agreement or thereafter. I agree that if I should make any permitted recording, I will do so only under a written contract expressly prohibiting its use by any person other than Capitol for any purpose other than that for which such permitted recording was originally made. Conditioned upon Capitol's obtaining all necessary rights and licenses from any persons involved, including my written consent (which consent may be withheld for any reason), I agree that any performance by me during the term of this agreement for a person other than Capitol

-20-

INITIAL

MJB:rls/2-12-79/3

("outside performances") may be used by Capitol in the manufacture, distribution, sale, advertising, and exploitation
of records upon the same terms and conditions as are applicable under this agreement to records manufactured from masters
recorded for Capitol during the then current period; however,
no masters embodying such outside performance shall be in
furtherance or in fulfillment of the minimum number of masters required in the then current period as set forth in the
Payment and Master Schedule hereinabove nor shall Capitol be
obligated to pay me amounts specified in Section 25. hereof
with respect to such masters embodying such outside performance.

16.  Capitol and I agree to indemnify and hold the
other harmless from any claims, damages, expenses (including reasonable attorney's fees), and litigation which may
come about as a result of a breach by Capitol or me (as the
case may be) of any of our respective representations or
warranties contained in this agreement.  Pending the determination of any claim relating to the foregoing as it relates
to me, Capitol shall have the right to withhold from royalties otherwise payable to me hereunder an amount reasonably
related to the amount of such claim plus reasonable anticipated attorney's fees (excluding amounts paid to in-house
attorneys employed full-time by Capitol) unless I post a bond
in such amounts.  Capitol will account to me for interest
on said withheld royalties computed at the then current legal
rate.  If a lawsuit is not filed within one year from the
date Capitol received written notice of a particular claim,
Capitol shall release any amounts Capitol has withheld from
my royalties relating to such claim.  Capitol shall notify
me in writing of all such claims, and I shall have a right
to participate in the defense in any litigation in connection
therewith*  If Capitol settles a claim relating to me without
my prior written consent, I shall not be liable for indemnifying Capitol for the amount of the settlement, but will be
liable for expenses (including attorney fees other than
amounts paid to in-house attorneys employed full-time by
Capitol) which Capitol incurred up to and including the date
as of which the claim is settled.

17.  All notices which Capitol may be required or
desire to serve upon me shall be served upon me by registered or certified mail, return receipt requested, and any
statements and payments which Capitol may be required or
desire to serve upon me may be served personally upon me
by depositing same, postage prepaid, in any mailbox, chute
or other receptacle authorized by the United States Post
Office Department for mail addressed to me at the address
below my signature, or at such other address as I may from
time to time designate by written notice to Capitol to the
attention of the Secretary.  The date of service of any
notice, statement or payment so deposited shall be the date

*at my expense.

-21-

INITIAL

MJB:rls/2-12-79/3

of deposit. Capitol shall send a copy of each and every
notice Capitol may serve upon me to Kenneth L. Kraus,
Esquire, Hardee, Barovick, Konecky & Braun, 9665 Wilshire
Boulevard, Suite 300, Beverly Hills, California 90212.

18. All notices which I may be required or desire
to serve upon Capitol may be served upon Capitol by regis-
tered or certified mail, return receipt requested, at the
address in the heading of this agreement, attention Secre-
tary, or at such other address as Capitol may from time to
time designate by written notice to me. The date of service
of any notice so deposited shall be the date of deposit.

19. The terms set forth in this agreement and all
attachments hereto, including, but not limited to, the
Addendum and the Schedule of Restricted Musical Works,
constitute the entire agreement between Capitol and me,
all prior negotiations and understandings being merged
herein. I represent that no person acting or purporting
to act on behalf of Capitol has made any promises or repre-
sentations upon which I have relied except those expressly
found herein. This agreement may only be altered by an
instrument executed by both Capitol and me. No failure by
Capitol to perform any of its obligations under this agree-
ment shall be deemed a material breach of this agreement
until I have given Capitol written notice of its failure to
perform and such failure has not been corrected within 30
days from and after the date Capitol receives such notice.
If Capitol assigns substantially all of its other artist
agreements as hereinafter specified, Capitol may assign this
agreement or any part hereof or any rights hereunder to a
(i) parent, (ii) subsidiary, (iii) or an affiliate, (iv) or
to any person acquiring all or substantially all of Capitol's
assets. Notwithstanding any assignment, Capitol shall remain
ultimately liable with respect to the fulfillment of its
obligations pursuant to the terms and conditions hereof.

20. This agreement shall become effective only when
executed by me and an authorized signer on behalf of Capitol.
It shall be deemed to have been made in the State of California
and its validity, construction, breach, performance and opera-
tion shall be governed by the laws of the State of California
applicable to contracts made and to be performed in California.

21. If there shall exist any conflict between any
provision of this agreement and any material statute, law
or ordinance, the latter shall prevail, and the provisions
of this agreement affected shall be curtailed, limited or
eliminated to the extent (but only to the extent) necessary
to remove such conflict; and as so modified this agreement
shall continue in full force and effect. If the payments
provided by this agreement shall exceed the amount permitted
by any present or future law or governmental order or
regulation, such stated payments shall be reduced while such

-22-

INITIAL

MJB:rls/2-12-79/3

limitation is in effect to the amount which is so permitted;
and the payment of such amount shall be deemed to constitute
full performance by Capitol of its obligations to me here-
under with respect to compensation during the time when such
limitation is in effect.

22.  I represent that I am a member of the American
Federation of Musicians (called "AFM") in good standing,
or if I am not now a member in good standing of said union,
I agree to become a member in good standing of said union
subject to and in accordance with the applicable union
security provisions of the current AFM Phonograph Record
Labor Agreement.

23.  I represent that I am a member of the American
Federation of Television and Radio Artists (called "AFTRA")
in good standing or if I am not now a member in good stand-
ing of said union, if required I agree to become a member
in good standing of said union subject to and in accordance
with the applicable union security provisions of the AFTRA
National Code of Fair Practice for Phonograph Recordings.

24.  a.  Capitol and I shall mutually agree as to each
individual to produce masters hereunder (called a "Producer")
and as to all compensation to be paid to the Producer with
regard to the foregoing in this Section 24.  Capitol agrees
to pay the Producer directly on my behalf any advances, fees,
and/or royalties provided for in the applicable Producer
agreement.  Any advances, Producer's fees, and royalties
paid by Capitol to a Producer shall be recoupable from roy-
alties payable to me hereunder.  Notwithstanding the fore-
going, but only with respect to the first two albums re-
leased from masters to be delivered hereunder, the increment
of royalties in excess of $.1858 per album (based on a sug-
gested retail list price of $7.98) but less than $.2478 per
album (based on a suggested retail list price of $7.98)
payable to a Producer shall be Capitol's sole responsibility
and shall not be recoupable from my royalties ("Nonrecoupable
Royalties"); provided that the Nonrecoupable Royalties with
respect to any record with a suggested retail list price
greater or lesser than a suggested retail list price of
$7.98 shall be proportionately increased or decreased.

b.  Unless otherwise requested by me, Capitol
shall directly enter into a Producer agreement with each
Producer incorporating such financial and creative terms
and provisions concerning credit to be accorded the Producer
as Capitol and I shall mutually approve.

-23-

MJB:rls/2-12-79/3

25. Any masters to be recorded hereunder shall be recorded by me and a Producer upon the following terms and conditions:

    a. Prior to recording, I or Producer shall submit a written proposal to Capitol for the recording of masters hereunder embodying my performances (called the "recording proposal"). This proposal shall be substantially in the form of Exhibit "A" hereto and shall specify the selections to be recorded, the number of vocalists and/or musicians to be employed, an estimate of the "costs of recording masters" (hereinafter called "recording budget"), including, without limitation, applicable union scale to me; Producer fees, Producer advances, Producer costs of transportation, Producer accomodations, and Producer per diems; vocalists; musicians; conductors; contractors; arrangers (including "sketchers"); orchestrators; and copyists, rehearsal studio rental prior to and during recording, and studio rental (including editing time) in connection therewith; and the proposed time, date and place of the recording sessions. In each period of this agreement I or Producer shall submit recording proposals covering production of at least the number of masters shown in the "Minimum No. of Masters" column in the Payment and Master Schedule in Section 2. above. I shall have the right to approve any recording proposal submitted by Producer. I shall have the further right to approve costs not included in the recording budget incurred or to be incurred by the Producer including but not limited to costs for Producer's transportation, Producer's accomodations, and Producer's per diems, prior to Capitol's paying therefor.

INITIAL

b.  I shall not record any masters except pursuant to an approved recording proposal containing a mutually approved recording budget.  If Capitol does not approve a recording proposal within five days after its submission, it shall be deemed disapproved and I shall work with Capitol to arrive at changes in the recording proposal so it can become an approved proposal.

c.  In connection with each recording session under this Section 25., the Producer and I will make arrangements for and engage recording studios, vocalists, conductors, contractors, musicians, arrangers (including "sketchers"), orchestrators and copyists.

d.  (i) Capitol shall have the right and opportunity to have a representative attend each recording session.

(ii) If Capitol is notified that a particular representative is unacceptable, said representative shall not attend future recording sessions.  No inadvertent or casual failure by Capitol to adhere to the foregoing shall be a breach, and any breach of the foregoing shall be deemed to be nonmaterial.

e.  (i) For each lp-master or master recorded hereunder, Capitol shall pay all expenses incurred in connection with the recording of masters recorded hereunder up to the recording budget in an approved recording proposal. If total expenses exceed the amounts approved in the recording budget in the applicable approved recording proposal, I shall be responsible for and shall promptly pay such excess. If Capitol pays any such excess, such payments shall be a direct debt from me to Capitol which, in addition to any other remedy Capitol may have, Capitol may recover from royalties, advances or other payments to be made by Capitol to me under this agreement.

(ii) Notwithstanding anything to the contrary contained in Paragraph e.(i) and only with respect to the first lp-master recorded in the initial period, Capitol hereby approves a recording budget ("approved recording budget") in the amount of $100,000.00 for recording such lp-master pursuant to an otherwise approved recording proposal.

-24-

INITIAL

(iii) Notwithstanding anything to the contrary contained in Paragraph e.(i) and only with respect to the second lp-master recorded in the initial period, Capitol hereby approves the greater of the following amounts as the approved recording budget for recording such lp-master pursuant to an otherwise approved recording proposal:

        A.  $125,000.00; or

        B.  $150,000.00 if at the time I commence recording the second album in the initial period hereof with the intent of completing same, the first album recorded in the initial period hereof has aggregate net U.S. sales of at least 100,000 units [other than sales (1) through a club distribution plan, (2) of budget line records, (3) of premium records, (4) to military post exchanges, and/or (5) to wholesalers in the USA solely for export to customers outside the USA]; or

        C.  The amount derived using the Formula, defined in Subparagraph 25.e.(x) hereinbelow, applicable to said second lp-master in the initial period. No recording budget payable pursuant to this Item C. shall exceed $250,000.00.

(iv) Notwithstanding anything to the contrary contained in Paragraph e.(i) and only with respect to the first lp-master recorded in the first option period, Capitol hereby approves the greater of the following amounts as the approved recording budget for recording such lp-master pursuant to an otherwise approved recording proposal:

        A.  $200,000.00; or

        B.  The amount derived using the Formula, defined in Subparagraph 25.e.(x) hereinbelow, applicable to said first lp-master in the first option period. No recording budget payable pursuant to this Item B. shall exceed $500,000.00.

(v) Notwithstanding anything to the contrary contained in Paragraph e.(i) and only with respect to the second lp-master recorded in the first option period, Capitol hereby approves the greater of the following amounts as the approved recording budget for recording such lp-master pursuant to an otherwise approved recording proposal:

        A.  $225,000.00; or

        B.  The amount derived using the Formula, defined in Subparagraph 25.e.(x) hereinbelow, applicable to said second lp-master recorded in the first option period. No recording budget payable pursuant to this Item B. shall exceed $500,000.00.

INITIAL

(vi) Notwithstanding anything to the contrary contained in Paragraph e.(i) and only with respect to the first lp-master recorded in the second option period, Capitol hereby approves the greater of the following amounts as the approved recording budget for recording such lp-master pursuant to an otherwise approved recording proposal:

A.  $250,000.00; or

B.  The amount derived using the Formula, defined in Subparagraph 25.e.(x) hereinbelow, applicable to said first lp-master recording in the second option period. No recording budget payable pursuant to this Item B. shall exceed $600,000.00.

(vii) Notwithstanding anything to the contrary contained in Paragraph e.(i) and only with respect to the second lp-master recorded in the second option period, Capitol hereby approves the greater of the following amounts as the approved recording budget for recording such lp-master pursuant to an otherwise approved recording proposal:

A.  $300,000.00; or

B.  The amount derived using the Formula, defined in Subparagarph 25.e.(x) hereinbelow, applicable to said second lp-master recorded in the second option period. No recording budget payable pursuant to this Item B. shall exceed $600,000.00.

(viii) Notwithstanding anything to the contrary contained in Paragraph e.(i) and only with respect to the third lp-master recorded in the second option period, Capitol hereby approves the greater of the following amounts as the approved recording budget for recording such lp-master pursuant to an otherwise approved recording proposal:

A.  $350,000.00; or

B.  The amount derived using the Formula, defined in Subparagraph 25.e.(x) hereinbelow, applicable to said third lp-master recorded in the second option period. No recording budget payable pursuant to this Item B. shall exceed $600,000.00.

(ix) The total costs for recording a particular master hereunder shall be all costs incurred in or incident to producing said master, up to, but not including, the final lacquer master.

-26-

INITIAL

MJB:rls/1-22-79/2

If the total costs for recording a particular lp-master pursuant to this Section 25. do not exceed the amount of the approved recording budget, Capitol shall pay me the difference between the total costs and the amount of the approved budget relating to such lp-master not later than 60 days following the delivery to Capitol of such lp-master ("Recording Fund Difference"). Notwithstanding the foregoing, and if applicable, Capitol shall advance me a portion of the Recording Fund Difference for a particular lp-master, but only after the immediately preceding album has been delivered to Capitol, and only after a recording proposal pursuant to Section 25. hereinabove for said particular album has been submitted to and accepted by Capitol. Conditioned upon the foregoing, Capitol shall advance to me and shall deduct from the Recording Fund Difference the following monies for a particular lp-master, which monies are recoupable from my royalties hereunder, within 14 days after I commence recording with the intent to complete said lp-master:

A. With respect to the first album in the first option period only: an advance of the larger of

(1) $25,000.00; or

(2) The difference between the amount derived by using the Formula (as same is defined in Subparagraph 25.e.(x) hereinbelow) applicable to the recording budget for the first album in the first option period and $175,000.00; but in no event shall I be entitled to an advance of more than $50,000.00.

For the purpose of this Subparagraph (ix)(A) only, the period of computing the Formula shall be from the date of release of the Preceding Album until the end of the month preceding the commencement, rather than the completion, of recording the Applicable Master.

B. With respect to the second album in the first option period, an advance of $50,000.00.

C. With respect to the first album in the second option period, an advance of $75,000.00.

D. With respect to the second album in the second option period, an advance of $75,000.00.

E. With respect to the third album in the second option period, an advance of $100,000.00.

-27-

INITIAL

MJB:rls/2-12-79/3

If the total costs for recording a particular lp-master plus the foregoing advance against the Recording Fund Difference for said lp-master exceed the amount of the applicable approved budget, I shall be responsible for said excess. If Capitol pays any such excess, such payments shall be a direct debt from me to Capitol, which in addition to any other remedy Capitol may have, Capitol may recover from advances, royalties or other payments made by Capitol to me under this agreement.

(x) The word "Formula" shall refer to the derivation of a recording budget for an applicable lp-master ("Applicable Master") by computing an amount equal to two-thirds of the aggregate USA and Canadian net royalties accrued to me hereunder with respect to sales of the album immediately preceding the Applicable Master ("Preceding Masters") from the date of release of said Preceding Master until the end of the month preceding the completion of recording the Applicable Master. For the purpose of the above computation:

(1) Royalties shall not be counted in respect of sales through a club distribution plan, sales to military post exchanges, sales of "Best of" records, repackaged records, budget line records, premium records, and/or to wholesalers in the USA*solely for export to customers outside the USA*

(2) Neither "Best of" nor "Live" lp-masters shall be construed as either Applicable Masters or Preceding Masters.

(3) Capitol may exclude from net royalties reasonable reserves against anticipated returns, not to exceed 15% of the royalties attributable to gross sales in the applicable computation period, without accounting for returns.

f. I shall see to it that all union contracts or union session reports shall be received by Capitol so that payments may be timely made by Capitol and if I fail to do so with the result that Capitol is required to pay any penalty sum for making a late payment under the American Federation of Television and Radio Artists National Code of Fair Practice for Phonograph Recordings or the American Federation of Musicians Phonograph Record Labor Agreement, such payments shall be a direct debt from me to Capitol which, in addition to any other remedy Capitol may have, Capitol may recover from advances or royalties or any other payments to be made by Capitol to me under this agreement.

*and Canada

INITIAL

Exhibit A -053

g.  I shall arrange that all bills incurred
with respect to recording which takes place pursuant to
an approved recording proposal shall be sent to Capitol
after having placed on such bills sufficient identification
so that Capitol shall be able to ascertain the particular
approved proposal involved and the nature of the bill.

26.  All payments by Capitol under Section 25. shall
be recoupable from royalties, and where specifically set
forth, advances otherwise payable to me under this agree-
ment.

27.  Capitol agrees to pay me a nonreturnable advance
of $125,000.00 ("Advance") which Advance is payable within
seven days from the date hereof.  Said Advance is recoupable
from any and all royalties otherwise payable to me under
this agreement.

28.  I agree to have the minimum masters required
hereunder finished and delivered to Capitol as follows:

a.  The first lp-master in each period of this
agreement shall be finished and delivered within four months
following the commencement of each such period.

b.  I will not commence recording with the
intention of recording an entire lp-master the next lp-
master until I have delivered the immediately prior lp-
master.

c.  I will not deliver any lp-master and Capitol
shall not be obligated to accept same sooner than seven
months or later than 12 months after delivery of the imme-
diately prior lp-master.

d.  Notwithstanding anything to the contrary con-
tained in the Payment and Master Schedule hereinabove, no
period of the term hereof shall expire until four months
after the last lp-master required in said period is deliv-
ered to Capitol.

29.  Notwithstanding anything to the contrary con-
tained herein, prior to the manufacture and sale hereunder
by Capitol or its licensees of records embodying sound
synchronized with or accompanied by visual images of me or
another subject ("Audiovisual Records"), Capitol and I shall
negotiate in good faith with respect to royalties payable
for such Audiovisual Records taking into account prevailing
rates being paid by other record companies to artists of
my comparable stature, and Capitol shall not release such
Audiovisual Records in the absence of written agreement on
such royalties.

-29-

INITIAL

MJB:rls/2-12-79/3

30. Notwithstanding anything to the contrary contained herein, with respect to records manufactured from masters recorded hereunder which are used as so-called "loss leaders" for other records not manufactured from masters recorded hereunder by being given away or furnished as a sales inducement to independent distributors, sub-distributors or dealers, royalties will be computed and paid as though such records had been sold at their normal whole-sale prices and therefore full royalty rates shall be payable on such records hereunder; provided, nothing contained in this Section 30. shall be construed as requiring Capitol to pay royalties in connection with records distributed as free and/or bonus records under a club distribution plan. Capitol will not use records hereunder as "loss leaders" in any national campaigns of advertising, promotion, or dis-tribution which campaigns originate or are under the direct supervision of authorized personnel at Capitol's national office at the address set forth hereinabove.

31. Nothing contained in this agreement shall prevent or prohibit me from performing as a "sideman" or background vocalist for the making of records for any person; pro-vided that I do not receive cover credit or credit as a featured artist, my likeness is not used, my name is not printed on the liner of such records in a size, style or color of print any larger or more prominent than that size, style or color of print used to credit any other sideman on such records, and a readable credit line is printed on the liner of such records in substantially the following form:

> "(name of applicable member) appears
> by courtesy of Capitol Records, Inc."

32. Notwithstanding anything to the contrary contained in this agreement, Capitol and its licensees shall not sell records manufactured from masters recorded hereunder as premiums without my prior written consent which consent may be withheld for any reason.

33. Subject to Subparagraph 33.d. hereinbelow, but notwithstanding anything else to the contrary contained in this agreement, Capitol and its licensees shall not in the absence of my written consent, do the following:

a. Sell records manufactured from masters record-ed hereunder as budget line records during the term hereof and for a period of at least one year from the date of ex-piration or other termination of this agreement. Thereafter Capitol may sell records on a budget line but only if my royalty account is in a debit balance at the expiration of said one year period; or

-30-

INITIAL

b.   During the term hereof and one year there-
after, (1) license the use of or itself use masters recorded
hereunder for sale by means of so-called TV Broadcast pack-
ages or other special market type sales; or (2) grant syn-
chronization licenses to third parties with respect to mas-
ters recorded hereunder for the purpose of including such
masters in motion picture or television soundtracks.  There-
after Capitol may grant said synchronization licenses
only if my royalty account is in a debit balance at the ex-
piration of said one year period; or

c.   Subject to the aforesaid terms and provisions
of this Section 33., Capitol shall not have the right to
sell a particular record as a "close-out" or "cut-out" until
such record has been deleted from Capitol's catalog.

d.   Notwithstanding anything to the contrary
contained in this agreement, subject to Section 34. hereof,
Capitol shall at all times during the term of this agreement
and thereafter have the right to license and/or sell records
manufactured from masters recorded hereunder to and/or
through record clubs.

34.   Notwithstanding anything to the contrary con-
tained herein, Capitol agrees that it shall not authorize
any record club to release any masters recorded hereunder
within the first 90 days following the initial release by
Capitol of said masters in the USA.

35.   With respect to a "Best of" type album:

a.   Capitol shall have the right to release a
maximum of one "Best of" album manufactured from masters
recorded hereunder at such time after the expiration or
other termination of this agreement as Capitol in its sole
discretion shall determine.  The total number of masters
on said "Best of" album shall be determined solely by Capi-
tol, but the selections to be embodied on said album shall
be mutually approved.  If there is a disagreement as to
which masters shall be embodied on the "Best of" album,
Capitol and I shall each choose, but only from the "A" sides
of singles released hereunder, 50% of the remaining masters
to be embodied on said "Best of" album.  If there is an odd
number of availabilities on the "Best of" album, I shall
choose the extra selection.

b.   Any of my rights to approve and/or select
masters pursuant to Paragraph 35.a. above shall be deemed
waived if Capitol does not receive an applicable written
response within 20 days after Capitol solicits same from
me in writing.

-31-

INITIAL

MJB:rls/2-12-79/3

c.  The royalties for a "Best of" album as same may be escalated pursuant to the terms hereof, shall consist of the applicable royalty rate, on a pro rata basis, for each master embodied thereon, as of the date said master was initially delivered to Capitol.  Notwithstanding the foregoing, if my royalty account is in a credit balance as same is computed at the end of the month preceding the release of said "Best of" album, then the royalty for the entire album will be at the royalty rate for an album delivered in the second option period hereof.

d.  I shall not be entitled to a Recording Fund Difference or any portion thereof, or any other advance with respect to said "Best of" album.

e.  Said "Best of" album shall be in addition to and not in lieu of any other masters as set forth in the Payment and Master Schedule hereinabove.

36.  With respect to "Live" recordings:

a.  Except as otherwise set forth in this Section 36., all masters hereunder shall be so-called "studio" masters, it being understood and agreed that there shall be no "Live" recordings hereunder without Capitol's prior written consent.

b.  Capitol and I agree that I shall record one "Live" lp-master during the term hereof, which lp-master shall be in addition to masters to be recorded pursuant to the Payment and Master Schedule hereinabove.

c.  The total number of masters on said "Live" album shall be determined solely by Capitol, but the selections to be embodied on said album shall be mutually approved. If there is a disagreement as to which masters shall be embodied on the "Live" album, Capitol and I shall each choose 50% of the remaining masters to be embodied on said "Live" album.  If there is an odd number of availabilities on the "Live" album, I shall choose the extra selection.  Capitol and I shall mutually approve the times and places to record said "Live" lp-master.  If not recorded during the initial and option periods hereof, said "Live" lp-master shall be deemed to be a required lp-master for the second option period for the purposes of Paragraph 28.d. above.

d.  The royalty applicable to a "Live" album, as same may be escalated pursuant to the terms hereof, shall be the royalties specified in the Payment and Master Schedule for that period in which the "Live" lp-master is delivered.

-32-

INITIAL

MJB:rls/2-12-79/3

e. Capitol shall only be obligated to pay actual recording costs in connection with the "Live" album, which costs are recoupable from my royalties hereunder; I shall not be entitled to a Recording Fund Difference, or any portion thereof, or any other advance with respect thereto.

f. Notwithstanding anything to the contrary in this Paragraph 36, if this agreement expires or otherwise terminates prior to the commencement of the second option period, then there shall be no obligation to record or deliver masters for said "Live" lp-master.

37. a. Capitol agrees to release or cause to be released in the USA and Canada an album manufactured from each lp-master delivered hereunder within 90 days after the lp-master has been delivered and all approvals have been obtained, including but not limited to artwork approval. If Capitol does not release said album within said 90 days, I may terminate this agreement subject to Capitol's ability to cure such breach pursuant to the terms of Section 19. hereinabove.

b. Capitol agrees to release or cause to be released (as such term "released" is commonly understood in the record industry) in the United Kingdom, Germany, Holland, France, Australia, and Japan (each individually referred to as "Territory") an album manufactured from each lp-master delivered hereunder. For purposes of this Paragraph 37.b., a release in a particular Territory does not require records to be manufactured in such Territory. Subject to the terms and conditions of Capitol's applicable foreign license agreement, Capitol will use its best efforts to cause its licensees in the aforementioned Territories to release said records as soon as possible after the U.S. release of such records.

38. Payments to me provided herein other than union scale shall be made to "The Knack", c/o Upstart Management, or to such other address as I may direct Capitol by notice in writing, and payment so made shall fulfill Capitol's obligation hereunder to each of the group's signatories.

39. Notwithstanding anything to the contrary contained herein, in the event I am entitled by virtue of the copyright laws of the USA to receive with respect to records manufactured hereunder a public performance fee from any source, broadcast or otherwise, nothing herein contained shall be construed to deprive me of the right to receive such royalty or my portion of such royalty. Capitol agrees that if with respect to records manufactured from masters recorded hereunder the "artist portion" of such public

-33-

INITIAL

MJB:rls/2-12-79/3

performance fees are not paid directly to me or a repre-
sentative of me and Capitol receives all of the public per-
formance fees, Capitol shall pay me 50% of the net public
performance fees received by Capitol with respect to such
records less any amounts Capitol is required to pay to any
other person who contributed to the recording of the
applicable record.

-33a-

INITIAL

Exhibit A -059

MJB:rls/2-12-79/3

40. Notwithstanding anything to the contrary con-
tained herein, no royalties shall be payable on records
furnished as free and/or bonus or at a substantially reduced
price to members and other participants in a club distribu-
tion plan ("club free records"), except that if on a cumu-
lative basis the aggregate number of club free records
exceeds 50% of the total number of sold and club free records
distributed, Capitol shall pay the royalties applicable to
records sold through a club distribution plan on the number
of club free records distributed in excess of 50% of the
total number of sold and club free records distributed.

41. Notwithstanding anything to the contrary con-
tained in Item 2.j.(iv)(2) with respect to records given
away or distributed or invoiced on a "no charge" basis as
a sales inducement as specified in Item 2.j.(iv)(2) ("Sales
Inducement Records"):

a. During the initial period, if out of each
100 albums distributed, more than 10 albums are distributed
as Sales Inducement Records, Capitol shall pay on such excess
the royalties set forth in the Payment and Master Schedule,
as same may be increased.

b. During the initial period, no royalties shall
be payable on any singles distributed as Sales Inducement
Records.

c. During each option period, royalties set
forth in the Payment and Master Schedule as same may be
increased, will be paid on all such albums given away or
distributed as Sales Inducement Records unless and to the
extent I consent to the contrary, which consent will not be
unreasonably withheld. Such consent will be deemed granted
if Capitol does not receive written notification to the
contrary within five days after my receipt from Capitol of
written notice of the applicable "free goods program."

d. During each option period, if out of each
100 singles distributed more than 50 singles are distributed
as Sales Inducement Records, Capitol shall pay on such excess
the royalties set forth in the Payment and Master Schedule,
as same may be increased.

42. Notwithstanding anything to the contrary con-
tained in this agreement, I shall not be obligated to de-
liver to Capitol "outtakes" as that word is commonly under-
stood in the recording industry or masters in excess of the
masters I am required or consent to deliver to Capitol here-
under. Neither Capitol nor I shall have the right during or
after the term hereof to sell, use, or otherwise exploit in
any manner whatsoever any or all of said outtakes or excess
masters.

-34-

INITIAL

MJB:rls/2-12-79/3

43. a. I shall have the right to approve the following material which I do not supply Capitol concerning me and/or records hereunder (including "Best of" and "Live" records): (i) album cover artwork, (ii) back cover and inner sleeve liner content and artwork, (iii) biographical material, (iv) any use of my signature, (v) USA album labels, and (vi) any likeness of me. Approval of any of the foregoing shall be deemed granted if I do not notify Capitol in writing to the contrary within five days after Capitol notifies me that the applicable material is available for approval. Capitol's inadvertent or casual breach under this Section 43.a. shall be deemed to be nonmaterial.

b. Expressly conditioned upon Scott Anderson ("Anderson") actively working full-time as my manager, and further expressly conditioned upon Fieger or Anderson being available in sufficient time for Capitol to meet advertising, promotion, merchandising, fabrication, and release deadlines, Capitol agrees to use best efforts to consult with Fieger or Anderson with regard to advertising and merchandising campaigns created by or under the direct supervision of authorized personnel at Capitol's national office, at the address set forth hereinabove, which concern me and/or records hereunder, including but not limited to all national ads, press releases, press kits, merchandising aids, and television and radio commercials, and all artwork, photographs and biographical material used in connection therewith (all of the foregoing are hereinafter referred to as "Advertising Material"). If Capitol is notified by registered mail that any planned Advertising Material is unacceptable to me, Capitol agrees, if practicable, to use its best efforts to prevent or discontinue the use of same. To the extent a curable breach hereof occurs, Capitol hereby agrees to use best efforts to cure said breach; however, any breach by Capitol under this Paragraph 43.b., whether curable or not, shall be deemed to be nonmaterial. Solely for the purposes of this Section 43., Anderson or Fieger shall send any applicable notices, registered mail to all of the following persons at Capitol: (i) the applicable department head, (ii) Vice-President of A & R, (iii) Vice-President of Creative Services, and (iv) Vice-President of Business Affairs.

44. With respect to each single record manufactured by Capitol hereunder and sold in the USA and Canada, I shall have the right, during the term hereof, of prior approval of:

a. the selections to be embodied on each single record, and

b. the final edit for each selection to be embodied on each single, which approval shall be deemed granted if I do not approve or disapprove same within 10 days after Capitol notifies me that said single is available for approval.

-35-

INITIAL

MJB:rls/2-12-79/3

45. Capitol agrees to give me the following records, which are to be used for promotional purposes only, and are not to be sold:

a. 250 copies of each particular album delivered and released pursuant to the terms and conditions of this agreement.

b. 500 copies of each single record released pursuant to the terms and conditions of this agreement.

46. a. (i) Capitol and I acknowledge and agree that during the initial period hereof, I may schedule and conduct up to two tours in major U.S. markets featuring me, the first in connection with the promotion and selling of the first album required in the initial period ("First Tour"), and the second in connection with the promotion and selling of the second album required in the initial period ("Second Tour").

(ii) If I so schedule the First Tour and/or Second Tour, I shall submit to Capitol, in connection with and prior to the commencement of the applicable Tour, the commencement date of the Tour, a Tour itinerary, schedule, and budget for Capitol's approval. Subject to Capitol's approval of the foregoing commencement date, itinerary, schedule and budget, Capitol agrees to pay me an advance in an amount equal to my projected applicable Tour expenses in excess of the projected applicable Tour revenues as same shall be specifically set forth in the aforesaid budget. Any such advance is deemed recoupable from royalties payable to me by Capitol hereunder. Management expenses are specifically excluded from said applicable budget. In lieu thereof, management commission shall be included in the budget and shall be projected on a performance by performance basis. For the purposes hereof, management commissions shall be deemed to be the lesser of the following: 20% of the projected revenue for the applicable performance in an applicable Tour or the sum of $300.00 for said applicable performance. The word "performance" is deemed to include one or more "sets" as the word "sets" is generally understood in the music performing industry.

b. Capitol and I acknowledge and agree that during the initial period hereof, I may schedule and conduct a foreign tour in connection with the promotion and selling of the first and/or second album required in said initial period. Capitol hereby agrees to support such a tour on the same conditions, and in the same manner as either or both of the U.S. Tours are supported, pursuant to Paragraph 46.a. hereinabove.

-36-

INITIAL

c.  Upon Capitol's request, I shall account to Capitol for actual expenses incurred in connection with the applicable Tour referred to in Paragraphs 46.a. and/or 46.b. hereinabove.

47.  If I record, mix, edit, and/or master any masters pursuant to the terms of this agreement using Capitol's studios and/or facilities, I shall not pay more than Capitol's then current Schedule of Standard Costs, which current schedule is attached hereto as Exhibit "B".

48.  Capitol agrees that once a particular lp-master is delivered to and accepted by Capitol, Capitol shall not, without my prior approval, remix, re-edit, resequence, or otherwise alter said lp-master (except with respect to singles as set forth in Section 44. hereinabove).  Capitol further agrees that the mix, sequence, and edit of any particular lp-master delivered hereunder and released as an album outside the USA shall be the same as for said particular album released in the USA.

49.  With respect to each final and fully-proofed reference disc of records recorded hereunder in the USA, I shall have the right, during the term hereof, of prior approval, which approval shall be deemed granted if I do not disapprove same within 10 days after Capitol notifies me that said reference disc is available for approval.

50.  Notwithstanding anything to the contrary contained herein:

a.  Capitol shall pay me an additional sum of $10,000.00 within 14 days after the first lp-master required in the initial period hereof is delivered to Capitol, which sum is recoupable from royalties payable to me hereunder, and which sum shall be used for the purpose of purchasing wireless guitar pick-ups.

b.  Capitol shall hold on my behalf an additional $15,000.00, which sum shall be used for public relations-type services to be rendered by third parties in connection with my recording services hereunder ("P. R. Fund").  Said P. R. Fund shall be recoupable from royalties payable to me hereunder, and subject to my prior consultation with Capitol as to the nature of and reason for the expenditures to be incurred, Capitol shall disburse to such third parties said P. R. Fund, or any portion thereof, within 14 days after I

-36a-

INITIAL

MJB:rls/2-12-79/3

have requested same and have so consulted with Capitol.  I
shall not request disbursement of said P. R. Fund, or any
portion thereof, prior to the delivery of the first lp-master
required in the initial period hereof.

Very truly yours,

(
(
( DOUG FIEGER
(
( Social Security Number
(
(
(
( BERTON AVERRE
(
Group performing        ( Social Security Number
as "The Knack"          (
(
(
(
( BRUCE GARY
(
( Social Security Number
(
(
(
( PRESCOTT NILES
(
( Social Security Number
(

Agreed and Accepted:        c/o Scott Anderson
                            Upstart Management
CAPITOL RECORDS, INC.       P. O. Box 46051
                            Los Angeles, California 90046

By:

Title:    PRESIDENT
        An Authorized Officer

-37-

MJB:rls/2-12-79/3

Contract No.

Los Angeles, California

G R O U P   S U P P L E M E N T

Capitol Records, Inc.
1750 North Vine Street
Hollywood, California 90028

Gentlemen:

      Concurrently herewith we are entering into an exclusive phonograph record contract (called the "Agreement") with Capitol Records, Inc. (called "Capitol") and the following shall constitute an integral part of the Agreement to the same extent as if included therein.

    1.   The services covered by the Agreement are those of a vocal group known as <u>"The Knack"</u> (called the "Group") and each of us is a member of the Group. There are no other members of the Group.

      a.  All payments under the Agreement other than applicable union scale shall be paid to The Knack partnership, c/o Upstart Management, or such other address as Capitol is notified of in writing. Except as provided in Paragraph 8., Doug Fieger, Berton Averre, Bruce Gary, and Prescott Niles all agree to look solely to The Knack partnership for payment of all royalties and/or fees, as the case may be, and will not assert any claim in this regard against Capitol or in this regard attempt to prevent the manufacture, sale, or distribution of phonograph records manufactured from masters recorded under the Agreement.

      b.  We jointly and severally represent and warrant that (i) to the best of our knowledge Doug Fieger is the sole owner of the professional name "The Knack"; (ii) that to the best of our knowledge no other person, firm or corporation has the right to use the said professional name or to permit it to be used in connection with phonograph records; and (iii) we have authority to grant Capitol the right to use the said professional name as provided in the Agreement. Our breach of Items (i), (ii), and/or (iii) of this Paragraph 1.b., shall not entitle Capitol to terminate the Agreement. We jointly and severally agree to indemnify and hold Capitol harmless from any claims, damages, expenses (including reasonable attorney's fees other than in-house attorneys employed full-time by Capitol), and litigation which may come about because of Capitol's use of the said professional name in conformance with the Agreement. Pending the determination of any claim relating to the foregoing as it relates to me,

-38-

INITIAL

Capitol shall have the right to withhold from royalties otherwise payable to me hereunder an amount reasonably related to the amount of such claim plus reasonable anticipated attorney's fees (excluding amounts paid to in-house attorneys employed full-time by Capitol) unless I post a bond in such amounts.  Capitol will account to me for interest on said withheld royalties computed at the then current legal rate.  If a lawsuit is not filed within one year from the date Capitol received written notice of a particular claim, Capitol shall release any amounts Capitol has withheld from my royalties relating to such claim.  Capitol shall notify me in writing of all such claims, and I shall have a right to participate in the defense in any litigation in connection therewith.  If Capitol settles a claim relating to me without my prior written consent, I shall not be liable for indemnifying Capitol for the amount of the settlement, but will be liable for expenses (including attorney fees other than amounts paid to in-house attorneys employed full-time by Capitol) which Capitol incurred up to and including the date as of which the claim is settled.

2.  a.  If we refuse or neglect or fail to perform together for Capitol in fulfillment of the obligations agreed to be performed under the Agreement, Capitol may by notice in writing terminate the Agreement entirely or may terminate the engagement under the Agreement of the member or members of the Group who refuse, neglect or fail to perform. Notwithstanding the foregoing, Capitol may not terminate the Agreement on the basis that the drummer or bass player (currently Bruce Gary and Prescott Niles, respectively) leaves the Group or otherwise refuses, fails, or neglects to perform for Capitol under the Agreement.

b.  Any member of the Group whose engagement is so terminated may perform for the purpose of recording any selection as to which the applicable restrictive period specified in the Agreement has expired.

c.  If the Agreement is not terminated entirely under  Paragraph 2.a., of this Group Supplement, (i) the members of the Group whose engagements are terminated shall not use the professional name of the Group in any commercial or artistic endeavor; (ii) the said professional name shall be and remain the property of Doug Fieger; (iii) the persons engaged to replace the members of the Group whose engagements are terminated shall be mutually agreed upon by Capitol and the remaining members.  Neither party shall unreasonably withhold agreement with regard thereto.  Capitol may elect to suspend the term of this agreement from the date such member(s) leave the Group until 15 days after a new member is approved by Capitol.  Notwithstanding the foregoing, if either Doug Fieger or Berton Averre leaves the Group, and a mutual agreement cannot be reached as to a replacement therefor, Capitol may elect to terminate the engagement of the remaining members of the Group by notice in writing.

-39-

INITIAL

MJB:rls/2-12-79/3

3.   No changes in the members of the Group may be made without Capitol's prior written consent. If any change is made with Capitol's consent, the members released shall be subject to the restrictions specified in items (i) and (ii) of Paragraph 2.c. of this Group Supplement.

4.   In the event a member's engagement is terminated hereunder by notice from Capitol pursuant to Section 2. hereinabove or by mutual consent, each applicable party shall be relieved and discharged from liability for masters unrecorded at the time of such notice or mutual consent.

5.   If the term of the Agreement expires by the mere passage of time (as contrasted with a termination effected by notice or notices from Capitol), Sections 2., 3., and 4. of this Group Supplement shall not be applicable.

6.   If any member ceases to be a member of the Group, such member shall continue to look solely to The Knack partnership for payment of all applicable royalties and/or fees in accordance with Paragraph 1.a. of this Group Supplement.

7.   As used in this Group Supplement, the words "we", "us", and every other grammatical variation shall mean each of the signatories hereto, individually, collectively, and as a member of the Group; and the rights of Capitol and the obligations, liabilities, prohibitions and restrictions imposed upon all of the signatories as contained in this Group Supplement shall be deemed to be applicable to the signatories hereto individually, collectively, as a member of the Group, and/or as a member of any other group.   Subject to Paragraph 2.a. hereinabove, a breach of this Group Supplement by any one of the signatories hereto shall, at Capitol's election, be deemed a breach by all.

8.   If any member ceases to be a member of the Group (such member who ceases to be a member of the Group is called the "Leaving Member") then Capitol may in addition to all of its other rights pursuant to the Agreement and this Group Supplement by notice in writing to the Leaving Member at any time within 60 days following the date Capitol consented in writing to such Leaving Member ceasing to be a member of the Group elect to record the Leaving Member individually upon the same terms and conditions set forth in the Agreement and this Group Supplement and for the remainder of the term provided in the Agreement (as such term may be or have been extended, suspended or renewed) relating to the Group including without limitation the same remaining minimum and maximum number of lp-masters required to be recorded and the same royalty rates applicable to the Group in effect at the time said Leaving Member departs from the Group, as said royalty rate may be escalated or thereafter increased except: (i) Capitol shall pay the Leaving Member an advance recoupable from his royalties of $25,000.00, as same may be adjusted as hereinafter stated, within 14 days after Capitol notifies the Leaving Member of

-40-

INITIAL

MJB:rls/2-12-79/3

Capitol's election to record the Leaving Member. Said
$25,000.00 shall be adjusted for cost of living by multiply-
ing said $25,000.00 by a fraction (which fraction is herein-
after called the "Cost of Living Adjustment"), (1) the denom-
inator of which shall be the "Consumer Price Index-United
States Average, all items and food" as published by the
Bureau of Labor Statistics of the United States Department
of Labor ("Index") for the month of January, 1979; and (2) the
numerator of which shall be the Index for the month previous
to the month which Capitol notifies the Leaving Member of
Capitol's election to record said Leaving Member; (ii) in
addition, for the first lp-master (other than "Live" or "Best
of" lp-masters) delivered to Capitol by the Leaving Member,
the applicable recording budget shall be as specified for the
first album delivered in the initial period as set forth in
Paragraph 25.e.(ii) as said recording budget shall be adjusted
by the Cost of Living Adjustment; and for the subsequent
lp-masters delivered to Capitol by the Leaving Member, the
applicable (1) recording budget as said particular recording
budget shall be adjusted by the Cost of Living Adjustment,
and (2) Recording Fund Difference and advances related there-
to, shall be determined pursuant to the terms and conditions
of Section 25. (and all paragraphs contained therein) of the
Agreement relating to subsequent albums delivered thereunder;
(iii) the Leaving Member shall record at least one lp-master
during the then current period of the Agreement upon all of
the terms and conditions that are applicable to the first
lp-master to be recorded by the Group during such period;
(iv) Capitol shall set up a separate account with respect to
records manufactured and sold embodying the performances of
the Leaving Member and such account shall not be cross-
collateralized with the account relating to the Group here-
under and vice versa; and (v) Capitol (with the Leaving Mem-
ber's approval) shall have the right to select the individual
producer of masters to be recorded by the Leaving Member.
In the event two or more members cease to be members of the
Group (such two or more members who cease to be members of
the Group are called the "Leaving Members") Capitol shall
have all of the rights set forth above in this Section 8.
that are applicable to the Leaving Member with respect to
the Leaving Members, with the further right to record the
Leaving Members as a duo or trio (as the case may be but only
if the Leaving Members so agree) in which event the terms and
provisions of the Agreement and this Group Supplement applic-
able to the Leaving Member shall be applicable to the Leaving
Members comprising the duo or trio as if such duo or trio
were collectively the Leaving Member.

-41-

INITIAL

MJB:rls/2-12-79/3

9. With respect to approvals, consents, selections and notifications to be made by, and consultations to be with me under the Agreement and this Group Supplement:

a. All approvals, consents, selections and notifications shall be made solely by, and all consultations shall be solely with, either of the following individuals:

(i) Fieger (but only so long as he remains a member of the Group), or

(ii) Anderson (but only so long as he remains as an active manager of the Group).

b. In connection herewith, Capitol shall have no obligation to notify any other member or representative of the Group; nor shall any notification from any other member or representative of the Group to Capitol be construed as notice to Capitol, or otherwise binding upon Capitol.

c. This Section 9. is a material part of the Agreement and this Group Supplement and may only be altered with the written consent of Capitol.

d. Subject to Paragraph 43.b. of the Agreement, if Fieger leaves the Group and Anderson no longer manages same, and if Capitol does not terminate the Agreement pursuant to the terms contained therein, Capitol and the remaining members shall mutually agree upon the individual(s) who shall have the abovementioned rights of approval, consent, selection, notification and consultation.

Group performing
as "The Knack".

_____
DOUG FIEGER

_____
BERTON AVERRE

_____
BRUCE GARY

_____
PRESCOTT NILES

-42-

Exhibit A -069

MJB:rls/1-22-79/2

## ADDENDUM

| Prefix | Price Upon Which Capitol Computes Distributor Discounts | Accounting Charge for Royalty Purposes | |
|---|---|---|---|
| | | PX Sales | All Other Regular Sales |
| SKAO | 7.98 | 2.3424 | 3.0964 |
| SMAS | 7.98 | 2.3424 | 3.0964 |
| SO | 7.98 | 2.3424 | 3.0964 |
| ST | 7.98 | 2.3424 | 3.0964 |
| SVAS | 7.98 | 2.3424 | 3.0964 |
| SW | 7.98 | 2.3424 | 3.0964 |
| 4XT | 7.98 | 2.6352 | 3.0964 |
| 4X2T | 10.98 | 3.6234 | 4.2602 |
| 4X3T | 20.98 | 6.9247 | 8.1398 |
| 4XWW | 7.98 | 2.6352 | 3.0964 |
| 8XT | 7.98 | 2.6352 | 3.0964 |
| 8X2T | 10.98 | 3.6234 | 4.2602 |
| 8X3T | 20.98 | 6.9247 | 8.1398 |
| 8XWW | 7.98 | 2.6352 | 3.0964 |
| Single Record | 1.29 | 0.4465 | 0.5929 |

INITIAL

Exhibit A -070

## PRODUCT BUDGET AND COST ACCUMULATION   MJB:rls/12-19-78/1

Artist _____

Producer _____

Capitol Contact _____

Album ☐        Single ☐

Album Number _____ Release Date _____

Album Title _____

Project/Session No. _____

Number of Selections: Est. _____ Actual _____

Est. First Date of Recording _____

Includes Session No. _____

Included in Project No. _____

| | BUDGET | COST CODE | ACTUAL* |
|---|---|---|---|
| **Musicians Payroll** | | | |
| Roy. Artist | | | |
| Scale & H & W | | | |
| Doubling/O. scl. | | | |
| Taxes @ (12%) | | | |
| P & W (10%) | | | |
| Total | | | |
| | | | |
| Cartage | | | |
| Int. Rental | | | |
| | | | |
| **Vocalists Payroll** | | | |
| Roy. Artist | | | |
| Scale | | | |
| Taxes @ (12%) | | | |
| P & W (7¾%) | | | |
| Total | | | |
| | | | |
| **Arranging & Copying** | | | |
| Arranging | | | |
| P & W (10%) | | | |
| Copying | | | |
| P & W (10%) | | | |
| Taxes @ (12%) | | | |
| Reproduction Expense | | | |
| Total | | | |

| | BUDGET | COST CODE | ACTUAL* |
|---|---|---|---|
| **Other Costs** | | | |
| Producer Fee | | | |
| Travel/Hotel | | | |
| Miscellaneous | | | |
| Total | | | |
| | | | |
| **Purchase Masters** | | | |
| **Lease Masters** | | | |
| Reimb. Recording Exp. | | | |
| | | | |
| **Studio Costs** | | | |
| Outside Studio - R | | | |
| Outside Studio - N | | | |
| Quad | | | |
| | | | |
| Mastering | | | |
| Total | | | |
| Internal Studio - R | | | |
| Internal Studio - N | | | |
| | | | |
| Total | | | |
| | | | |
| **Summary of Recording Costs** | | | |
| Recoverable | | | |
| Non-Recoverable | | | |
| Total | | | |

**SUBMITTED BY:**

Outside Producer _____  Date _____

In-house Producer _____  Date _____

**APPROVED BY:**

V.P., A & R _____  Date _____

Business Affairs _____  Date _____

**FOR ADMINISTRATION ONLY:**

Contract Type _____

Contract Requested _____

Contract In _____

Administration _____  Date _____

TOTAL SIDES RECORDED _____     TOTAL SIDES RELEASED _____

**REMARKS:**

* R = Recoverable    N = Non-recoverable          Exhibit "A"

Summary _____ $ _____

Revised _____ $ _____

INITIAL

-44-

MJB:rls/12-19-78/1

## SELECTIONS

| SONG TITLE | MASTER NO. | RELEASE INFO. |
|---|---|---|
| ( 1) | | |
| (2) | | |
| (3) | | |
| (4) | | |
| (5) | | |
| (6) | | |
| (7) | | |
| (8) | | |
| (9) | | |
| (10) | | |
| (11) | | |
| (12) | | |

-45-

INITIAL

MJB:rls/1-22-79/2

HOLLYWOOD STUDIO

SCHEDULE OF STANDARD COSTS

EFFECTIVE:   JULY 1, 1978

| Description | Tab Code | Standard Cost | Unit of Measure |
|---|---|---|---|
| ¼" Recording Tape (2500' Roll) | 100 | .003 | Ft. |
| ½" Recording Tape (2500' Roll) | 101 | .007 | Ft. |
| 1" Recording Tape (2500' Roll) | 102 | .012 | Ft. |
| 2" Recording Tape (2500' Roll) | 103 | .027 | Ft. |
| 2" Recording Tape (3600' Roll) | 104 | .026 | Ft. |
| ¼" Grand Master Tape | 105 | .005 | Ft. |
| 2" Grand Master Tape | 106 | .033 | Ft. |
| 5" Plastic Reel | 111 | .646 | Ea. |
| 7" Plastic Reel | 112 | .903 | Ea. |
| 2" x 10⅝" Reel | 113 | 17.370 | Ea. |
| ¼" x 10" Reel | 114 | 5.005 | Ea. |
| ¼" x 12" Reel | 115 | 6.490 | Ea. |
| ¼" x 14" Reel | 116 | 7.455 | Ea. |
| ½" x 10" Reel | 117 | 8.568 | Ea. |
| 1" x 10" Reel | 118 | 8.894 | Ea. |
| C-45 Blank Cassette | 120 | .488 | Ea. |
| C-60 Blank Cassette | 121 | .534 | Ea. |
| C-90 Blank Cassette | 122 | .652 | Ea. |
| 8T-45 Blank Cartridge | 130 | .588 | Ea. |
| 8T-60 Blank Cartridge | 131 | .631 | Ea. |
| 8T-90 Blank Cartridge | 132 | .739 | Ea. |
| 8T-100 Blank Cartridge | 133 | .777 | Ea. |
| 8T-120 Blank Cartridge | 134 | .877 | Ea. |
| Magnetic Diskette | 141 | 6.000 | Ea. |
| Set-up 25 or More | 211 | 33.424 | Ea. |
| Direct to Disc Set-up | 212 | 500.000 | Ea. |
| Rehearsal | 222 | 10.000 | Hr. |
| Session – Studio A (A&R) | 321-322-323 | 83.134 | Hr. |
| Session – Studio B (A&R) | 324-325-326 | 83.134 | Hr. |
| Session – Studio C | 217-218-219 | 62.317 | Hr. |
| Session – Studio A | 421-422-423 | 83.134 | Hr. |
| Session – Studio B | 424-425-426 | 83.134 | Hr. |
| Playback – Studio A (A&R) | 331-332-333 | 83.134 | Hr. |
| Playback – Studio B (A&R) | 334-335-336 | 83.134 | Hr. |
| Playback – Studio C | 437-438-439 | 61.700 | Hr. |
| Playback – Studio A | 431-432-433 | 83.134 | Hr. |
| Playback – Studio B | 434-435-436 | 83.134 | Hr. |
| Transfer & Edit | 313 | 44.819 | Hr. |
| Transfer & Edit – Studio A (A&R) | 341-342-343 | 83.134 | Hr. |
| Transfer & Edit – Studio B (A&R) | 344-345-346 | 83.134 | Hr. |
| Transfer & Edit – Studio C | 458-459-460 | 61.700 | Hr. |
| Transfer & Edit – Studio A | 441-442-443 | 83.134 | Hr. |
| Transfer & Edit – Studio B | 444-445-446 | 83.134 | Hr. |
| Remix – 8 Tr. | 314-315-316 | 53.586 | Hr. |
| Remix – 16 Tr. & 24 Tr. | 317-318-319 | 70.043 | Hr. |

Exhibit "B"

-46-

INITIAL

MJB:rls/1-22-79/2

## SCHEDULE OF RESTRICTED MUSICAL WORKS

| Selection | Company | Date Recorded | Type of Restriction | Expiration of Restriction |
|-----------|---------|---------------|---------------------|---------------------------|
| | | | | |

N O N E

### IMPORTANT INSTRUCTION

1.  If there are any musical works you cannot record for Capitol because of a restriction in a previous record contract, please delete the word "NONE" and insert all of the information called for in the Schedule of Restricted Musical Works for each restricted selection.

2.  If you are under no restrictions as regard musical works you can record for Capitol, place your initials in the Schedule of Restricted Musical Works.

-47-

INITIAL

MJB:rls/12-19-78/1

Contract No.

Los Angeles, California

Date:

### DECLARATION RE COLLECTIVE WORK
### AND POWER OF ATTORNEY

Capitol Records, Inc. ("Capitol") and I are parties to an agreement (called the "Capitol-Artist Agreement"), with respect to "masters" and "sound recordings", "phonorecords" and "copies" manufactured from such masters (individually and collectively called the "Works"). For valuable consideration, receipt of which is hereby acknowledged:

A.   The undersigned (jointly and severally if more than one) acknowledge and agree that each master recorded under the Capitol-Artist Agreement embodying the results and proceeds of my services (i) is prepared within the scope of Capitol's engagement of my personal services and is a work made for hire, or (ii) as part of an lp-master constitutes a work specially ordered by Capitol for use as a contribution to a collective work and shall be considered a work made for hire. I further acknowledge that Capitol is the exclusive owner of all right, title and interest in and to each Work throughout the world, including, but not limited to, all rights of the owner of copyright specified in 17 U.S.C. §106.

B.   Notwithstanding the provisions of Paragraph A. above, I agree to the extent, if any, that I may be deemed an "author" of any Work, I grant and assign to Capitol all exclusive right, title and interest in and to such Work throughout the world, including, but not limited to, all rights of the owner of copyright specified in 17 U.S.C. §106. For purposes of this Paragraph B.:

1.   I hereby make, constitute and appoint Capitol, irrevocably and coupled with an interest, my true and lawful Attorney for me and in my name, place and stead to sign, execute, acknowledge, deliver and record all documents and instruments necessary or desirable to grant and assign to Capitol all exclusive right, title and interest in and to the Works throughout the world, including, but not limited to, all rights of the owner of copyright specified in 17 U.S.C. §106.

2.   The documents and instruments referred to in Paragraph B. 1. above shall include, but shall not be limited to: documents to apply for and obtain all registration of copyrights in and to any Work, and documents to assign such copyrights to Capitol.

3.   The undersigned grants to said Attorney full power and authority to do and perform all and every act and thing whatsoever requisite, necessary or appropriate to be done with respect to the Works as fully to all intents and purposes as I might or could do if personally present, hereby ratifying all that my said Attorney shall lawfully do or cause to be done by virtue of this Power of Attorney.

4.   My said Attorney is empowered to determine in his sole discretion the time when, purpose for and manner in which any power conferred upon him shall be exercised, and the conditions, provisions and covenants of any document or instrument which may be executed by him pursuant to this Power of Attorney.

INITIAL

-48-

MJB:rls/12-19-78/1

C.   When the context of this document so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

IN WITNESS WHEREOF, the undersigned has executed this "Declaration Re Collective Work and Power of Attorney" on the date first above written.

_____
DOUG FIEGER

_____
BERTON AVERRE

Group performing
as "The Knack"

_____
BRUCE GARY

_____
PRESCOTT NILES

INITIAL

-49-

Capital Records, Inc. 1750 North Vine Street, Ho⸻ ood, California 90028, (213) 462-6252

RE: CONTRACT NO. 6425



Robert L. Young, Vice President

J u n e
4 th
1 9 7 9

The Knack
c/o Ken Kraus, Esq.
Rosenfeld, Kassoy & Kraus
8383 Wilshire Blvd.
Suite 510
Beverly Hills, California 90211

Gentlemen:

This will confirm your agreement that all costs
actually incurred or paid by Capitol at your request
or at the request of your manager in connection with
tours, personal appearances or other performances
by you may be recovered by Capitol from any and all
royalties payable to you, as and when earned pursuant
to your current recording contract with Capitol. Such
costs may include but are not limited to costs of
transportation, accomodations, equipment rental,
equipment purchase, costumes, rehearsal studio and
any other costs related to such appearances which
Capitol may agree to incur.

Please indicate your agreement to the foregoing
by signing the two enclosed copies of this letter
and returning them to me.

Very truly yours,

RLY:jg

AGREED:

_____
Doug Fieger

_____
Berton Averre

_____
Bruce Gary

_____
Prescott Niles

Vaulted
7-5-79
2ob

Exhibit A -077

MJB:rl/3-26-79/1

Re: Contract No. 6425

Los Angeles, California

Date: June 7, 1979

*Vaulted 6/21/79/rls.*

A-M-E-N-D-M-E-N-T

Capitol Records, Inc.
1750 North Vine
Hollywood, California 90028

Gentlemen:

Reference is hereby made to that agreement between Capitol Records, Inc. ("Capitol") and me dated February 22, 1979, being Capitol's Contract number 6425 concerning my exclusive recording services ("Agreement").

Capitol and I hereby amend the Agreement as follows:

1. I hereby acknowledge that I have read the terms and conditions of the producer's agreement between Capitol and Chinnichap Inc. ("Chinnichap") relating to the services of Mike Chapman ("Chapman") as the individual producer of the first lp-master to be recorded under the Agreement and I agree to be bound by the terms and conditions of said producer's agreement insofar as such terms and conditions affect me.

2. In the event Capitol pays Chinnichap or Chapman any royalties on Sales Inducement Records (as that term is defined in the Agreement) such royalties shall be deductible by Capitol from any and all royalties payable to me under the Agreement.

Each and every one of the other terms and conditions contained

Page -1- of 2 Pages

Exhibit A -078

MJB:rl/3-26-79/1

in said Agreement shall be as they now are and this document
shall change said Agreement only so far as specified herein.

Very truly yours,

(
( _____
( Doug Fieger
(
( _____
( Berton Averre
(
( _____
( Bruce Gary
(
( _____
( Prescott Niles

Group performing
as "The Knack"

c/o Scott Anderson
Upstart Management
P. O. Box 46051
Los Angeles, California 90046

Agreed and Accepted:

CAPITOL RECORDS, INC.

By: _____

Title: _____
       ROBERT L. YOUNG
       Vice President
       An Authorized Officer

-2-

Exhibit A -079

Capitol Records, Inc. 1750 North Vine Street, Hollywood, California 90028, (213) 462-6252



Vaulted 11/10/79
BAK

RE: CONTRACT NO. 6425

Robert L. Young, Vice President

July 31, 1979

The Knack
c/o Upstart Management
P.O. Box 46051
Los Angeles, California 90046

Gentlemen:

You have requested and we are in the process of advancing you the sum of $90,000 in support of your forthcoming Japanese tour.

Kindly acknowledge by signing and returning the enclosed copies of this letter that the aforesaid advance shall be in the same and hereby is recoverable from royalties as and when payable pursuant to contract number 6425.

Kind regards.

Sincerely,

RLY:jg

ACCEPTED AND AGREED:

Doug Fieger

Berton Averre

Bruce Gary

Prescott Niles

VDR:vkp/9-13-79/1

Re:  Contract No. 6425

Los Angeles, California

Date:  OCT 15 1979

A-M-E-N-D-M-E-N-T

Capitol Records, Inc.
1750 North Vine Street
Los Angeles, California  90028

Gentlemen:

   Reference is made to the agreement between Capitol Rec-
ords, Inc. ("Capitol") and me dated February 22, 1979, being
Capitol's Contract No. 6425, as amended, relating to my ex-
clusive recording services ("Agreement").

   Capitol and I hereby agree as follows:

   Concurrently herewith Capitol is entering into an amend-
ment ("Amendment") with Chinnichap, Inc. for Mike Chapman to
act as individual producer of the second lp-master to be re-
corded by me under the Agreement (which Amendment is at-
tached hereto and incorporated herein as Exhibit "A"), and I
agree to the terms and conditions of the Amendment insofar
as such terms and conditions affect me.

                                    Very truly yours,

                                    (_____
                                    (Doug Fieger

                                    (_____
                                    (Berton Averre

Group performing as                 (_____
   "The Knack"                      (Bruce Gary

                                    (_____
                                    (Prescott Niles

                                    c/o Scott Anderson
Acknowledged:                       Upstart Management
                                    P.O. Box 46051
CAPITOL RECORDS, INC.               Los Angeles, California  90046

By: _____
        ROBERT L. YOUNG
        Vice President
Title: _____
        An Authorized Officer
                                    vaulted 11/8/79
                                    vkp
              Page -1- of 2

VDR:vkp/9-13-79/1

Re:  Contract No. 6450

Los Angeles, California

Date:

A-M-E-N-D-M-E-N-T

Chinnichap, Inc.
8919 Sunset Boulevard
West Hollywood, California  90053

Gentlemen:

Capitol Records, Inc. ("Capitol") and Chinnichap, Inc.
("Company") are parties to an agreement dated as of Febru-
ary 1, 1979, being Capitol's Contract No. 6450, as amended,
("Agreement") relating to the services of Mike Chapman as
producer of masters embodying the performances of Capitol's
exclusive recording group pka "The Knack" ("Artist").

Prior to the date here Company has produced and deliv-
ered to Capitol one lp-master embodying the performances of
Artist ("First LP-Master").

Company agrees to produce and deliver to Capitol a sec-
ond lp-master embodying the performances of Artist upon the
same terms and conditions applicable to the production of
the First LP-Master.

Each and every one of the other terms and provisions of
the Agreement shall be and remain as they now are, and this
document shall change the Agreement only so far as specified
herein.

If the foregoing is our understanding and agreement,
please so indicate by signing in the space provided below.

Very truly yours,

CAPITOL RECORDS, INC.

Agreed:                        By:_____

CHINNICHAP, INC.               Title:_____
                                      An Authorized Officer

By:_____

Title:_____
       An Authorized Signer

-2-

Exhibit "A"



# AMERICAN FEDERATION OF MUSICIANS

### OF THE UNITED STATES AND CANADA

AFFILIATED WITH THE A.F.L.-C.I.O.

REGISTERED

CONTRACT NO. 6425

OFFICE OF THE PRESIDENT
1500 Broadway
New York, N. Y. 10036

*Vaulted 12|3|79 bak*

November 26, 1979

INTERNATIONAL
EXECUTIVE BOARD

VICTOR W. FUENTEALBA
President
1500 Broadway
New York, N.Y. 10036
Phone: Area Code 212—
869-1330

DAVID WINSTEIN
Vice-President
2401 Esplanade Avenue
New Orleans, La. 70119
Phone: Area Code 504—
947-1700

J. ALAN WOOD
Vice-President from Canada
101 Thorncliffe Park Drive
Toronto, Ont.,
Canada M4H 1M1

J. MARTIN EMERSON
Secretary-Treasurer
1500 Broadway
New York, N.Y. 10036
Phone: Area Code 212—
869-1330

A. A. TOMEI
3422 Oakmont Avenue
Philadelphia, Pa. 19136

MAX L. ARONS
261 West 52nd Street
New York, N.Y. 10019

MARK TULLY MASSAGLI
5020 Stacey Avenue
Las Vegas, Nev. 89108

EUGENE V. FREY
Suite 2228, Kroger Bldg.
1014 Vine Street
Cincinnati, Ohio 45202

MAX HERMAN
817 North Vine Street
Hollywood, Calif. 90038

JAMES C. PETRILLO
President Emeritus
and Advisor
1500 Broadway
New York, N.Y. 10036

GEORGE V. CLANCY
Treasurer Emeritus
432 S. W. Eighth Avenue
Boynton Beach, Fla. 33435

STANLEY BALLARD
Secretary-Treasurer Emeritus
1500 Broadway
New York, N.Y. 10036

JOHN TRANCHITELLA
Executive Officer Emeritus
10742 Lyndale Street
North Hollywood,
Calif. 91602

Ms. Carole Haney
CAPITOL RECORDS, INC.
1750 North Vine Street
Hollywood, California, 90028

Re:  "The Knack"

Dear Ms. Haney:

This will acknowledge receipt of contract covering the services of Doug Fieger, Berton Averre, Bruce Gary, Prescott Niles, dated February 22, 1979.

Please be advised that same has been approved by the American Federation of Musicians in accordance with the terms of your AFM Phonograph Record Labor Agreement.

Very truly yours,

*Robert H. Crothers*

Robert H. Crothers,
Executive Assistant
to the President

RHC/eeb

DATE: December 18, 1979
TO: Carole Haney
OFFICE: Legal    ☐ CI  ☐ CRI  ☐ CMP

FROM: Arnold J. Holland
OFFICE: Director, Business Affairs    ☐ CI  ☐ CRI  ☐ CMP

**Capitol** RECORDS
A CAPITOL INDUSTRIES-EMI Company

# MEMO

SUBJECT:   THE KNACK

    Please do a change of address for The Knack (Upstart Management)
per the attached letter from Ken Kraus' office.


    AJH:jg

    Attachment


SIGNED: _[signature]_

FORM 1669 S
REV. 23 1/78

MJB:mp/3-14-80/1

Re:   Contract No. 6425

Los Angeles, California

Date:   As of February 1, 1980

A-M-E-N-D-M-E-N-T

Capitol Records, Inc.
1750 North Vine Street
Hollywood, California 90028

Gentlemen:

Reference is hereby made to that agreement between Capitol Records, Inc. ("Capitol") and me dated February 22, 1979, as amended, being Capitol's Contract No. 6425, relating to my exclusive recording services ("Agreement").

Capitol and I hereby amend the Agreement as follows:

1.   a.   Capitol and I each acknowledge that pursuant to Paragraph 46. of the Agreement, foreign tour support monies paid by Capitol in the sum of $186,679.00 were recouped from my royalties ("Recouped Sum"), and an additional $3,482.18 advanced for foreign tour support by Capitol is to be debited to my royalty account ("Debited Sum").

b.   Capitol and I agree that the Recouped Sum is hereby deemed re-credited to my royalty account ("Re-Credited Sum").  The Re-Credited Sum and the Debited Sum shall be recouped from me, but only from one half of the net royalties * otherwise payable to me in each accounting period only with respect to record sales outside the USA and Canada.  The other one half of net royalties attributable to record sales outside the USA and Canada shall be paid to me subject to being used for all recoupment purposes under the Agreement other than foreign tour support.  In connection with the foregoing, I hereby acknowledge receipt of $93,339.50, constituting one-half of the Recouped Sum.

*(exclusive of royalties payable to a Producer, as the word "Producer" is defined in Paragraph 24 of the Agreement)

Page -1- of 5 pages

Vaulted 5/2/80
nP

INITIAL

MJB:mp/3-14-80/1

c.  Future foreign tour support advances shall be recouped as follows:

(1)  One half of such sums shall be nonrecoupable up to a total of $150,000.00.

(2)  The balance shall be recoupable from me but only from one half of the net royalties (exclusive of royalties payable to a Producer, as the word "Producer" is defined in Paragraph 24. of the Agreement) otherwise payable to me in each accounting period only with respect to record sales outside the USA and Canada.  The other one half of net royalties attributable to record sales outside the USA and Canada shall be paid to me subject to being used for all recoupment purposes under the Agreement other than foreign tour support.

2.  a.  Notwithstanding anything to the contrary in the Agreement with respect to net sales specified in Column "A" below of albums manufactured from the applicable lp-master listed in said Column "A", Capitol agrees to pay the royalties correspondingly set forth in Column "B" in addition to any other royalties set forth in the Agreement.

| Column "A" | Column "B" |
|---|---|
| (1)  For USA net sales of the second album in the initial period in excess of 2,000,000 units and for Canadian net sales of same which are sold after the last day of the month the album achieved USA net sales of 2,000,000 copies | $.0638 USA based on a suggested list price of $7.98 and the same number of Canadian pennies for Canadian sales |
| (2)  For USA net sales of the first album in the first option period in excess of 2,000,000 units and for Canadian net sales of same which are sold after the last day of the month the album achieved USA net sales of 2,000,000 copies | $.0638 USA based on a suggested list price of $7.98 and the same number of Canadian pennies for Canadian sales |

-2-

INITIAL

Exhibit A -086

MJB:mp/3-14-80/1

| | |
|---|---|
| (3)  For USA net sales of the second album in the first option period in excess of 2,000,000 units and for Canadian net sales of same which are sold after the last day of the month the album achieved USA net sales of 2,000,000 copies | $.0638 USA based on a suggested list price of $7.98 and the same number of Canadian pennies for Canadian sales |

     b.  The maximum additional royalties payable hereunder shall be $270,000.00 based upon a suggested list price of $7.98 (U.S.).

     c.  Said royalties set forth in Paragraphs 2.a. and 2.b. hereof shall be proportionately increased or decreased if the suggested list price of $7.98 is increased or decreased, as set forth in Paragraph 2.d. of the Agreement.

     3.  I hereby agree that Capitol may elect to require me to record and deliver an additional "studio" lp-master in the second option period.  Said election shall be exercised by Capitol in writing the earlier of (i) five months following the delivery of the third studio lp-master required under the Agreement or (ii) three months following the release of the album embodying said third studio lp-master. If Capitol so elects to have said lp-master recorded and delivered, I shall record and deliver same pursuant to the terms and conditions of the Agreement including but not limited to Paragraph 25. thereof, except for the following:

     a.  The approved recording budget for said lp-master shall be the greater of:

     (1) $250,000.00; or,

     (2) The amount derived using the Formula, defined in Subparagraph 25.e.(x) of the Agreement, applicable to the fourth lp-master in the second option period.  Said approved recording budget shall not exceed $600,000.00.

     b.  Any Recording Fund Difference (as same is defined in Paragraph 25. of the Agreement) shall be paid to me as set forth in Paragraph 25. of the Agreement.

     c.  Said lp-master shall be delivered to Capitol within three months after Capitol's request therefor.

-3-

INITIA'

Notwithstanding the foregoing, if prior to or during said three month period I commence a tour pursuant to bona fide tour commitments made prior to Capitol's said request for said additional "studio" lp-master, and if all or a portion of said tour occurs during said three-month period, I shall not be required to deliver said lp-master until a reasonable date not to exceed three months after the expiration or other termination of said tour.

    d.  Notwithstanding anything to the contrary in the Agreement, the term of the Agreement shall not expire until four months after said lp-master is delivered to Capitol.

    4.  Notwithstanding Paragraph 35.a. of the Agreement to the contrary Capitol shall have the right to release one additional "Best Of" album manufactured from masters recorded under the Agreement upon the following terms and conditions:

    a.  During the term of the Agreement:

    (1)  In no event shall said "Best Of" album be released earlier than 12 months following the initial USA release of the album derived from the fifth "studio" lp-master delivered under the Agreement.

    (2)  (a)  Subject to Paragraph 4.a.(1) hereof, I shall have the right of approval (which may be withheld for any reason) as to the release of said "Best Of" album.  Said right of approval shall be exercised by me in writing within 14 days after Capitol notifies me in writing of its proposal to release same.  In the event I fail to approve or reject said proposal within the aforesaid time period, my approval with respect thereto shall be deemed to have been granted.

    (b)  Subject to Paragraph 4.a.(1) hereof, but notwithstanding Paragraph 4.a.(2)(a) hereof to the contrary, I shall have no right  of approval as to the release of said "Best Of" album if as of the date Capitol notifies me that Capitol intends to release said "Best Of" album both of the following conditions exist:

    (i)  I have not delivered to Capitol a studio lp-master (or "live" lp-master if Capitol so agrees in writing) for a period of at least twelve (12) months; and

    (ii)  An album embodying a studio lp-master (or "live" lp-master if Capitol so agrees in writing) has not been released by Capitol for a period of at least twelve (12) months.

- 4 -

(3)   Said "Best Of" album shall otherwise conform to the provisions of paragraphs 35.a, 35.b, 35.c, 35.d and 35.e of the Agreement.

b.   Upon expiration or other termination of the Agreement, and provided said "Best Of" album was not released during the term as provided above, Capitol may release said "Best Of" album upon those same terms and conditions not inconsistent with this Paragraph 4. as are set forth in Paragraphs 35.a, 35.b, 35.c, 35.d, and 35.e of the Agreement.

5.   Capitol hereby agrees to liquidate and pay me all reserves for returns held by Capitol for the period ended August 31, 1979, as set forth on Capitol's statement to me for said period.   Said payment shall be incorporated into Capitol's accounting and payments for the period ending February 29, 1980.

Each and every one of the other terms and conditions of said Agreement shall be and remain as they now are and this document shall change such agreement only so far as specified herein.

Very truly yours,

(DOUG FIEGER)

(BERTON AVERRE)

(BRUCE GARY)

(PRESCOTT NILES)

Group performing as
"The Knack"

Agreed and Accepted:

CAPITOL RECORDS, INC.

By: _____
ROBERT L. YOUNG
Vice President

Title: _____
An Authorized Officer

c/o Scott Anderson
Upstart Management
6671 Sunset Boulevard
Suite 1591
Hollywood, California 90028

- 5 -

# Exhibit B

KING & BALLOW          Fax:615-248-2860          May 21 2008  19:59          P.24

March 24, 2004

Michele Anthony
Sony Music Entertainment, Inc.
550 Madison Avenue
New York, NY 10022-3211

Zach Horowitz
Universal Music Group
2220 Colorado Avenue
Santa Monica, CA 90404

David H. Johnson
Warner Music Group, Inc.
75 Rockefeller Plaza
4th Floor
New York, NY 10019

Michael Smellie
BMG Entertainment
1540 Broadway
Times Square
44th Floor
New York, NY 10036-4098

David Munns
EMI Recorded Music
150 Fifth Ave.
8th Fl.
New York, NY 10011

Dear Friends:

We read with great interest Andrew Lack's February 5, 2004 interview in Daily Variety in which Mr. Lack expressed "surprise that lawyers in our business seem somewhat detached from this issue, almost ambivalent to the digital revolution...smart lawyers haven't stood up, and I think the reason is they're confused. I hope we can have more positive progress". Many of us heard Mr. Lack echo similar sentiments at the Entertainment Law Initiative luncheon in early February.

We are not ambivalent about the digital revolution and in fact are very cognizant of the important legal and business issues associated with file sharing. However we wish to express our concern about the manner in which major record companies are dealing with artists in the critical, new frontier of music downloads by iTunes and similar companies. Among the most sensitive issues is the royalty itself.

PIPS  EXHIBIT  64
DEPONENT
DATE 5-22-0
RENEE PACHECO, CSR, RPR

FBT - 00502

Case 2:12-cv-00806-MMM-JC   Document 32   Filed 08/01/12   Page 92 of 109   Page ID #:1139

Case 2:07-cv-03314-PSG-MAN     Document 326-4     Filed 01/10/2009     Page 3 of 4
KING & BALLOW     Fax:615-248-2860     May 21 2008  19:59     P.26

Rather than recognize the arrangements between the major labels and independent electronic distributors as licenses, for which we feel there can be no *bona fide* legal dispute, and paying our clients according to the applicable provision of their contracts, all five major record companies have adopted the position that paid downloads are equivalent to sales of CDs through retailers. This *significantly* reduces the amount paid to our clients. The difference, in many cases, varies from the artists' contractual entitlement by more than two-thirds. While there may be a few exceptional contracts, mostly signed in the last 18 months, entitling labels to take this position, the vast majority do not.

Treating digital downloads as normal sales triggers a variety of other contractual provisions which generally would be inapplicable to permitted licensing.

The impact of this collective action by the record companies is three-fold:

First, it deprives our clients of the benefits of their contracts, and unjustly enriches the labels;

Second, paying the artists a mere fraction of their entitlement will validate consumers' feelings that choosing to pay for legitimate downloads in lieu of illicit file sharing will not ultimately benefit the artists; and

Finally, depriving artists of their fair share of on-line distribution revenue polarizes the issue, discouraging artists from lending support to the labels' efforts to mitigate piracy. Given the hearings in Sacramento on royalty issues, we cannot think of a better time for labels and artists to present a united front.

Digital distribution raises many other contractual, legal and philosophical issues currently the subject of considerable, thoughtful public and private debate. Contractual concerns related to various matters · not originally contemplated by the parties - if left unresolved, threaten to further impair the growth of new revenue streams. We must also recognize that legislative solutions may be necessary to insure uniformity and fairness to all parties affected by the current changes occurring in the marketplace. Unless we devise a consistent and mutually acceptable position on these issues, we risk further artist indifference, consumer apathy and the imposition of legislation that could further threaten our collective livelihoods.

FBT - 00503

The undersigned are prepared to commence an immediate dialogue on these issues and to help our clients become participants in the process of solving these challenging problems facing our industry. It is only in an environment of cooperation and fairness that artists can provide their critical assistance to the labels in this struggle.

Very truly yours,

David Altschul

Elliot Groffman

Jeremy Molir

Scott T. Brisbin

Gregg Harrison

Milton E. Olin Jr.

Kenneth L. Burry

Kenneth B. Hertz

Donald S. Passman

David Byrnes

Allen Lenard

Peter Paterno

Jay Cooper

Seth Lichtenstein

Steven J. Plinio

Fred Davis

Jeffrey Light

Eugene Salomon

Glenn B. Davis

Douglas Mark

Gary Stiffelman

Fred Goldring

Carole Milgrot Woeckner

Mitch Tenzer

Eric Greenspan

Francois Mobasser

Jamie Young

FBT - 00504

# Exhibit  C

Exhibit C -094



Copyright (c) 2005 Berkeley Technology Law Journal
Berkeley Technology Law Journal

2005

*20 Berkeley Tech. L.J. 933*

**LENGTH:** 9981 words

ANNUAL REVIEW 2005: PART II: ENTERTAINMENT LAW AND NEW MEDIA: X. REPRESENTING TALENT: A NOTE:  California's Recording Industry Accounting Practices Act, SB 1034: New Auditing Rights for Artists

**NAME:** By Lon Sorensen

**BIO:**  ©2005 Lon Sorensen The author hereby permits the reproduction of this Note subject to the Creative Commons Attribution-ShareAlike 2.0 License, the full terms of which can be accessed at http://creativecommons.org/licenses/by-sa/2.0/legalcode, and provided that the following notice be preserved: "This note was first published by the Regents of the University of California in the Berkeley Technology Law Journal's Annual Review of Law and Technology."

**LEXISNEXIS SUMMARY:**
 ... As home to both the entertainment industry and an unpredictable political climate, California is fertile land for novel ideas to take root in its state legal code. ...  Kevin Murray, the former talent agent-turned state senator from the Los Angeles area, was troubled by the California Court of Appeal ruling in Wolf v. Superior Court, which held there was no fiduciary duty between an author who had assigned his intellectual property rights to a distributor in exchange for contingent compensation from the exploitation of those rights. ...  The Wolf ruling prompted State Senator Murray to seek legislation that would directly counter the decision by expressly establishing a fiduciary duty between recording artist and record label. ...  Finally, the bill stipulated specific remedies for artists in cases of breach of that fiduciary duty: requiring a label to pay an artist's costs of an audit, legal fees, and interest if an audit revealed an underpayment of royalties greater than ten percent; requiring a label to pay an artist three times any amount of underpayment if the amount was greater than ten percent; permitting an artist to rescind her recording contract if the audit revealed an underpayment greater than twenty percent; and submitting any disputes concerning the payment of royalties arising from the audit to binding arbitration. ...

**TEXT:**
[*933]

    As home to both the entertainment industry and an unpredictable political climate, California is fertile land for novel ideas to take root in its state legal code. Nowhere was this phenomenon more evident than at Governor Arnold Schwarzenegger's signing of Senate Bill 1034 ("SB 1034") n1 on July 16, 2004. n2 Officially dubbed The Recording Industry Accounting Practices Act, n3 the bill was a response to the continuing outcry against royalty accounting practices in the music business. Artists had long bemoaned the power exercised by labels through recording contracts that gave the companies near complete control over a musician's royalty statements and financial freedom. By granting recording artists a statutory right to audit their record labels, n4 the law was the first of its kind in the nation and endowed artists with more access to information and greater control over their careers. n5

    [*934]  The legislation was largely the result of an impassioned state legislator responding to a high-profile issue that had both a personal and professional draw. n6 In 2002, after a cluster of news accounts exposed the myriad of problems surrounding royalty calculations in the music industry, State Senator Kevin Murray (D-Culver City) held a

Exhibit C -095

20 Berkeley Tech. L.J. 933, *

series of Senate hearings to allow both sides of the business - the recording artists and the record labels - to articulate their concerns before lawmakers. n7 What came to light was shocking to those outside of the entertainment world: an industry where artists had little idea where their earnings came from and little control over their financial futures. n8

While most artists' contracts contained a provision allowing them to audit their record labels' royalty statements, several formidable barriers made that provision historically more cosmetic than substantive. First, throughout the life of the contract, the onus was on the artist to prove that the label was underreporting sales and thereby underpaying royalties. n9 Audits could easily verify suspicions of underpayment, but this was an expensive venture for a new artist and also an unreliable one as the audit was not certain to uncover royalty discrepancies. Costing anywhere from $ 10,000 to $ 100,000, n10 an audit was also a luxury only established recouped artists could afford. Furthermore, audits often took several years to complete and the documents available for review were usually contractually limited, a provision that shielded the labels from unwanted scrutiny. n11 Artists that did find instances of royalty underpayment were contractually  [*935]  limited to only receiving what should have been paid to them under the terms of the original agreement, n12 leaving the artist at a financial disadvantage since she would personally have to pay for the services of an auditor or attorney. Finally, artists rarely chose to litigate over royalties under a breach -of-contract claim since an amiable relationship was preferred with the company that exercised such control over their careers. n13 Generally, artists just opted for a negotiated settlement to receive their money. n14

Based on these realities, State Senator Murray proposed potent legislation that established a fiduciary relationship between artist and label and that mandated punitive damages payable by labels in cases of breach. Yet the bill signed into law by the governor in 2004 was a far cry from the original bill envisioned by the senator in 2002. Gone was any language mentioning a fiduciary duty, punitive damages, or an artist's right to be released from a recording contract in cases of royalty underreporting. Instead, the bill established a simple set of statutory auditing rights that attached to every record contract. n15

This new law is significant not only in its novelty as a section in a state legal code, but also in its measured benefit to artists. At a minimum, the new law will help dissipate artists' suspicion about royalty underreporting in the state of California. And through an enumerated set of basic auditing rights, the law will help balance the scales of power long bemoaned by recording artists. This is all done without the heavy hand of government oversight and the uncertainties of a fiduciary relationship in the music industry setting. Thus, while SB 1034 is more limited in scope than the original bill, it is decidedly more sensible and pragmatic.

But aside from its merits, perhaps SB 1034's greatest impact can best be seen when viewed against the backdrop of other recent developments in the music industry. Accordingly, this Note examines the major changes left in the wake of SB 1034's passage. Part I tracks the history of the recording industry and the recent forces that are posing a challenge to its traditional structure. Part II details the major milestones leading up to the governor's signature on SB 1034, from recent California case law to the acrimonious hearings in the state capitol. Finally, Part III evaluates the lingering questions left by SB 1034's passage, namely (1) how the legislation interfaces with a recent California court ruling that shifted the burden of proof to record labels in litigation surrounding royalty payments; (2) whether the bill has unintended consequences that could toll the death  [*936]  knell for an already embattled industry; and (3) how the ominous legislation as originally proposed - which would have thrust a fiduciary duty on record labels and allowed for increased liability - may have prodded the industry toward the desirable path of self-reform. This Note concludes that SB 1034, with its limited approach to accounting reform, is superior to the sweeping law originally proposed by State Senator Murray due to its small but important role in the current evolution of the music industry.

I. BACKGROUND

A. Players in the Recording Industry

The cornerstone of the music industry, past and present, is the much-maligned recording artist contract. n16 To recording artists, it is the essential bridge between raw talent and the promised lands of future celebrity. To record labels, it is a proven conduit to the creative resources necessary to run a profitable enterprise. Called the hub around which nearly every aspect of the music industry revolves, n17 the central role of the recording contract has never been disturbed, despite profound technological changes in the world of music. New players and modes of distribution define the current state of the business, but artists are still bound to the terms of a written document that has changed very little since its inception.

1. Shifting Roles for Artist and Label

Exhibit C -096

20 Berkeley Tech. L.J. 933, *

The music recording industry owes its rise to technological innovation. n18 This technology was historically expensive and unavailable for private use, with record companies positioned as the only entities capable of making the significant investment in new machinery to make and record music. These companies invested significant resources in building more recording studios and in developing their artists and repertoire (A&R) departments to scout new talent. This A&R staff was responsible not only for locating talent, but also for writing and arranging the artist's music. Thus, A&R served a vital role in the hegemony exercised by the record labels over nearly every aspect of the music business, from fostering creativity to managing finances. n19

[*937]  However, the 1960s marked the gradual demise of the label's A&R staff as a musical contributor and the ascension of the record producer as a central participant in the creative process. n20 Originally the record companies employed the producer, but as they continued to play a central role in the marking of sound recordings, and as artists wanted more creative control over their music, producers left the employ of record labels to start their own production companies. n21 By the 1970s, producers functioned almost entirely separate from labels, thereby removing the creative aspect of music making from the record companies' control and confining the labels' A&R departments to simply identifying talent and managing the books. n22 This division of labor - with labels focused on finances and artists/producers focused on music - appeared to result in a healthy balance between making music and distributing the finished product. n23 But despite this new construct and the shifting responsibilities of the various players, the one entity that remained unchanged was the recording contract.

The financial success of the industry in the late 1970s attracted outside investment to the labels, beginning a series of mergers that resulted in record companies functioning as one branch of a bureaucratic conglomerate that was largely removed from the idiosyncrasies of the music business. n24 As the record labels became more corporate, the division of labor between artist and label only served to widen the growing gap in philosophies between them. The omnipresent recording contract began to be viewed by artists as a means of corporate control and manipulation - a tool to tie artists to a life of professional indentured servitude. n25

2. The Contemporary Milieu

Today, only four major record companies control over 90 percent of the recording contracts. n26 These companies - Universal Music Group, Sony BMG, n27 EMI Record Group, and Warner Music Group - funnel the  [*938]  music industry through the terms of a monolithic contract that has changed little over the past seventy years and has grown to over eighty pages in length. n28

Adding to the dominance of labels in the industry is their familiarity with the contracting process. Armed with experienced attorneys and oblique contracts, record labels have been able to ensure a deal that guarantees maximum income and considerable leverage for themselves. To labels, this is simple economics since they are corporations that must turn a profit in order to survive. n29 In line with this image, record labels portray themselves as "risk distributors, in the same vein as banks, oil wildcatters, and venture capital companies[,]" n30 who invest in artists they think will be successful despite the fact only a small percentage ever will be. As seen by industry representatives, record labels simply spread risk and hope for a return. n31

Not surprisingly, artists take an entirely different view of the industry, largely seeing themselves as victims of a detached corporate giant and a hard bottom line. Invoking metaphors of slavery and servitude, n32 they view the record companies as conspiring to keep them perpetually indebted to a plantation that also owns the product of their labor. n33 According to artists, nowhere else is this manipulation more evident than in the royalty accounting scheme established by the record contract. "Of the thousands of royalty compliance audits I've conducted over the past 30 years," reported one prominent accountant for recording artists, "I can recall only one instance where the artist owed money to the company," n34  [*939]  directly implying that labels generally always owe royalty money to artists.

B. Portents of Change

If the history of the music industry is defined by a static recording contract binding together label and artist, then the contemporary music industry is largely defined by forces that put this historical structure in doubt. The current era has witnessed better representation of artists, the rise of digital distribution, and the formation of groups to advocate on behalf of artists - trends that may or may not lead to the eventual marginalization of the recording contract.

The rise of the corporate record label also saw the concomitant ascension of the sophisticated talent lawyer. With an understanding of the labyrinthine record contract and the salient issues affecting an artist, modern talent lawyers ensure the best contracts possible for their clients by matching the sophistication of record label negotiators. As such, la-

Exhibit C -097

20 Berkeley Tech. L.J. 933, *

bels claim that recording contracts have become increasingly favorable to artists over the years. n35 If an album does gain success, labels are quick to highlight that artists - through their savvy management - almost always renegotiate their contracts for improved financial terms. n36

Digital distribution and the rise of the home computer have also ushered in profound changes to the business. The online music store is now a staple in music distribution and is fast becoming the preferred means of purchasing music for many consumers. n37 While these online stores are built on the traditional artist-label relationship defined by a recording contract, the ease of this Internet distribution is encouraging some artists to bypass this historical construct altogether.

The Magnificent Union of Digitally Downloading Artists ("MUDDA") is the most notable group advocating the abandonment of the recording contract. Formed in January 2004 by rock veteran Peter Gabriel, MUDDA strives to completely remove record labels from the music business by letting artists directly sell their music online. n38 It is difficult to  [*940]  predict the ability of MUDDA and other similar groups to change the traditional power structures in the music industry, but the groups' efforts are notable in that they represent the most extreme reaction to the current music industry by envisioning a business model free of labels and recording contracts.

Finally, once loosely affiliated artists are now coming together to combat shared obstacles and present a unified message to the world. Groups like the Recording Artists' Coalition n39 and the Future of Music Coalition n40 have served as rallying points for disparate musicians in search of a collective voice. From lobbying Congress to educating the public to helping mold public opinion, the groups have had measured success in counteracting the powerful and seasoned Recording Industry Association of America (RIAA).

## II. EVOLUTION OF SB 1034

The history of the recording industry formed the foundation for State Senator Murray's eventual legislation in the recording industry. But several pivotal events occurred before the state legislator proposed his sweeping changes to the industry and its players. These events - a decision from a California state court and enhanced media attention surrounding the music business - proved a powerful impetus for the senator to take legislative action.

### A. Impact of Wolf v. Superior Court

The ideas that would eventually take shape in SB 1034 owe at least some of their beginnings to a California state court. Kevin Murray, the former talent agent-turned state senator from the Los Angeles area, n41 was troubled by the California Court of Appeal ruling in Wolf v. Superior Court, n42 which held there was no fiduciary duty between an author who had assigned his intellectual property rights to a distributor in exchange for contingent compensation from the exploitation of those rights. The dispute in Wolf arose when an author transferred the rights to his novel  [*941]  and its cast of characters to the Walt Disney Corporation. n43 In exchange for acquiring these rights, Disney agreed to pay the author a fixed royalty of the receipts it earned from merchandising and other exploitation of the author's characters. n44 The agreement between Disney and the author further stated that Disney was not obliged to perform any of the rights granted to it under the contract and could freely assign or license all of the rights. n45 After Disney developed and co-produced a motion picture based upon Wolf's novel, Disney and the author entered into another agreement that not only confirmed the author's entitlement to the contingent compensation from the original agreement, but also empowered the author with specific audit rights. n46 Each time the author attempted to exercise these rights, however, Disney allegedly refused him access to the pertinent records. In his suit, the author claimed breach of the auditing contract and further accused Disney of underreporting revenues it received in connection with the characters. n47 Pointing to the exclusive control Disney exercised over information concerning the exploitation of the characters and the revenue received therein, the author argued that Disney's conduct not only amounted to a breach of contract, but also to a breach of fiduciary duty. n48

The Wolf court held that the "contractual right to contingent compensation in the control of another has never, by itself, been sufficient to create a fiduciary relationship where one would not otherwise exist." n49 The court also struck down the author's claim that a fiduciary relationship existed because he "reposed "trust and confidence' in Disney to perform its contractual obligation." n50 While every contract requires one party to place at least some trust and confidence in the other, the court reasoned, by no means does this establish the elements giving rise to a fiduciary duty. n51 Trust imbues every contract with the implied covenant of good faith and fair dealing, but public policy mandates it not create a fiduciary relationship since every contract would thus be prone to the heightened duties surrounding  [*942]  agency. n52 The court also rebuffed the author's claim that the profit-sharing nature of the agreement gave rise to a fi-

Exhibit C -098

20 Berkeley Tech. L.J. 933, *

duciary relationship. n53 Citing the absence of a joint venture between the author and Disney, and the fact that Disney was under no obligation to maximize profits from the author's characters, the court stated that no fiduciary duty existed between the two. "The contract plainly allowed an opportunity for nonmutual profit that is absent in fiduciary relationships." n54

The court next considered whether the author's contractual auditing rights created a fiduciary duty. The court determined that a relationship is either fiduciary in character or it is not; the remedy sought is irrelevant in defining the nature of the relationship. n55 Therefore, the presence of auditing rights "does itself not convert an arm's length transaction into a fiduciary relationship." n56

The Wolf court did, however, establish an important new presumption for artists suing over royalties in California courts. The author's final argument for a fiduciary duty centered around whether shifting the burden of proof to a party in exclusive control of financial records transformed the contractual relationship into a fiduciary one. n57 The author claimed, and the court agreed, that in contingent compensation cases where essential financial records are in the exclusive control of the defendant who would benefit from any incompleteness, public policy would best be served by shifting the burden of proof onto the defendant. The court ruled, however, that this burden shifting did not create a fiduciary duty since the nature of a contractual relationship is separate and distinct from the burden of proof. n58

The Wolf ruling prompted State Senator Murray to seek legislation that would directly counter the decision by expressly establishing a fiduciary duty between recording artist and record label. Seeing the two entities more as spouses than as business unions, n59 Murray believed a fiduciary duty between the two was not only appropriate, but entirely necessary. He felt a fiduciary relationship was a sure way to prevent opportunism in a situation where the company is often in the position to benefit itself rather than the artist through either negligent recordkeeping or intentional [*943] fraud. n60 The salient quality present in each form of fiduciary relationship is a level of profound inequality between the parties, n61 which State Senator Murray reasoned was true of artist-label agreements. A fiduciary duty in the context of recording contracts would be significant in that it would give the artists not only a contractual right, but also an empowering moral right to receive fair and accurate royalty statements. n62 The label would be "duty bound to act with the utmost good faith for the benefit" of the artist n63 and would be required to disclose all relevant information regarding royalties - a potent remedy that would dramatically increase the power of artists vis-a-vis labels.

B. SB 1034

In addition to Wolf, two articles in the Los Angeles Times further prodded State Senator Murray to introduce SB 1034. In one story, the paper detailed famous recording artists forced to rely on public assistance or denied a pension and health insurance because record labels underreported their royalty earnings - all outcomes that cost the public money in the form of state services. n64 The second article told how recording artists were forced to sue their labels just to secure a proper accounting of their royalty earnings. n65 Due to this media focus and the problems he perceived stemming from Wolf, State Senator Murray organized two hearings in the state capital to galvanize support for possible legislative action. These hearings were jointly chaired by the Senate Judiciary Committee and the Senate [*944] Select Committee on the Entertainment Industry and set the tone for the eventual legislation authored by the senator. n66

As originally drafted, SB 1034 proposed sweeping changes to the artist-label relationship. The bedrock of the original bill was a call for a fiduciary duty on recording companies to accurately account for royalties earned under a recording contract. n67 Moreover, the bill empowered artists with a statutory right that existed above and beyond the specific terms of each ad hoc contract to audit the accounting records for their royalties. Finally, the bill stipulated specific remedies for artists in cases of breach of that fiduciary duty: requiring a label to pay an artist's costs of an audit, legal fees, and interest if an audit revealed an underpayment of royalties greater than ten percent; requiring a label to pay an artist three times any amount of underpayment if the amount was greater than ten percent; permitting an artist to rescind her recording contract if the audit revealed an underpayment greater than twenty percent; and submitting any disputes concerning the payment of royalties arising from the audit to binding arbitration. n68

This proposed legislation would have profoundly transformed the recording industry in California by granting artists unprecedented contractual and remedial power. The current state of the law required an artist who suspected royalty underpayment to bring a lawsuit based on a violation of the duty of good faith and fair dealing - an unappealing and expensive route for most musicians. n69 Because there were no penalties against labels for the negligent underpayment of royalties, damages would generally be limited to expectation damages, or what was originally due under the terms of the contract. California law did provide penalties for the underpayment [*945] of royalties in cases of outright fraud, n70 but the artist had to prove a specific intent by the record label to fraudulently underpay. n71 Because specific intent

Exhibit C -099

20 Berkeley Tech. L.J. 933, *

was extremely difficult to prove in court and the artist could rarely afford to litigate, the record company was largely perceived as free to act negligently in its royalty accounting without penalty. n72 As stated by one industry accountant:

The [recording] companies play this "catch-us-if-you-can' game with artist royalties. It's not like they sit down and scheme how to take advantage of everybody. But the systems are designed to impede. They're archaic and the royalty staffs are lean. Only artists with muscle really have the ability to get their money. n73

Yet State Senator Murray's threatened seismic shift to the recording industry never took place. Whittled away by the legislative process and intense lobbying by the RIAA, SB 1034 as signed by Governor Schwarzenegger was significantly diluted and far less severe - a compromise package palatable to the recording industry conglomerates and legislators leery of government intervention in private contracting. While the bill creates a statutory right for artists to audit royalty statements issued by recording companies, it falls far short of establishing the fiduciary relationship originally advanced by State Senator Murray. n74 Artists may now only audit their labels once a year, and the artist must request this audit within three years after the end of a royalty earnings period as defined by the contract. n75 While artists can choose their own auditor and hire him on a contingency fee basis, they can only audit a particular royalty earnings period once. Auditors can audit a label on behalf of several artists at once, but if impropriety is found, artists are limited to the contractual remedies found in their individual contracts, with no enhanced right to punitive damages. n76 Thus, one of the seminal issues that gave birth to SB 1034 - the lack of a fiduciary duty between artist and label as defined in Wolf - ultimately failed to appear in the final passage of State Senator Murray's bill. n77

[*946]

III. ANALYSIS

Despite the differences between State Senator Murray's first draft and the bill as passed, SB 1034 provides artists a very tangible tool in their quest for equity in bargaining power and accuracy in royalty payments - audit rights with defined metes and bounds that attach regardless of contractual terms. Furthermore, when viewing the law in the context of recent reform in the industry, the legislation points to a larger shift towards artist information that invariably results in a balanced and more trusting environment in the music business, an environment that would be overwhelmed by the enormous weight of a fiduciary duty as originally envisioned by the senator.

A. SB 1034 and Wolf: Empowering Artists Both Before and After Litigation

The burden-shifting scheme outlined in Wolf empowers artists with information only after litigation has commenced, while SB 1034 grants artists the right to audit throughout the normal course of the artist-label relationship. Thus, State Senator Murray's bill is arguably more forward thinking and proactive, assuaging concerns before they grow. Wolf's evidentiary ruling is decidedly more reactive, gaining potency only after the start of formal legal proceedings.

At a cursory glance, the California court of appeal ruling in Wolf seemed to affirm the limited the rights of an artist who had assigned her intellectual property to a distributor. With the court refusing to impose a fiduciary duty on a company bound to a contingency compensation agreement with an artist, the distributors of assigned intellectual property rights appeared to score a major victory in the ruling. Record labels were able to maintain the status quo and confine artists' remedies to the terms of the contract and the implied covenant of good faith that included no heightened obligation of disclosure, no moral obligation to accurately account to an artist, and no elevated standard of diligence when managing an artist's royalties,

But the end of the Wolf opinion was capped with a brief discussion that quietly reshaped the contours of lawsuits between the two sides. Noting that an artist litigating against a corporate distributor faced an uphill battle without access to the all-important accounting records, the court ruled that the burden of proof in a royalty underpayment claim should be shifted away from the plaintiff artist and on to the defendant distributor:

In contingent compensation and other profit-sharing cases where essential financial records are in the exclusive control of  [*947]  the defendant who would benefit from any incompleteness, public policy is best served by shifting the burden of proof to the defendant, thereby imposing the risk of any incompleteness in the records on the party obligated to maintain them. n78

Exhibit C -100

20 Berkeley Tech. L.J. 933, *

While this shifting of the evidentiary burden does not transform the nature of the parties' relationship from contractual to fiduciary, n79 it is significant nonetheless. By placing the burden on the distributors to open their accounting books and prove that royalties are being paid correctly, the Wolf court granted artists a powerful right to access and knowledge. Although not the fiduciary duty State Senator Murray hoped to impose on labels, it is a notable victory for artists and a large step towards bringing transparency to the shrouded world of royalty accounting. Recording artists who now choose to file suit against their label alleging royalty underpayment have the luxury of having the label carry the burden of proof that the artist has been paid her fair share.

But the victory for artists that the Wolf ruling represents must be tempered by the practical difficulties of suing record companies. The steps leading up to this point are formidable: the artist must first hire an auditor to ascertain whether royalty underpayment has occurred, retain counsel for a lawsuit against the label, and then file a suit in court. This course of action is not only extremely expensive for an unrecouped artist struggling to break into the music industry, but it is also a hostile action against an entity without which most artists traditionally cannot live. Despite recent trends to the contrary, record labels and recording contracts are still a significant force in the music industry and the primary means by which artists gain a foothold in the business. Pushing a royalty underpayment contention to the point of litigation poisons the well between artist and label and stands as a harbinger of a future bumpy ride together. n80

But all is not lost, because it appears SB 1034 will serve as a preliminary safety valve by providing an artist with the right to audit before filing a lawsuit. State Senator Murray's legislation empowers artists with a discrete set of auditing rights that apply throughout the life of a recording contract and that transcend any stipulated terms in ad hoc negotiations. The bill also removes barriers to hiring an auditor, thus enabling an artist to address royalty concerns before resorting to litigation. Taken together, Wolf and SB 1034 vest artists with more rights and more information, [*948] thereby increasing artists' collective knowledge and ensuring that they reap the benefit of their album sales.

B. Possible Limitations and Ramifications of SB 1034

During the legislative hearings leading up to SB 1034's passage, some state lawmakers expressed open reticence about the effectiveness of a Sacramento-crafted law in the esoteric world of recording contracts. One state senator bluntly admitted that "I truly don't understand any of this." n81 Referring to the recording artists and record labels, he went on to say that

I understand in any business negotiation both sides try to protect themselves, but how do we get in the middle of this and not mess it up so badly, because trust me on this one, if we do get in the middle of this, we will mess it up. That is the nature of the legislative process. n82

With its skeletal set of mandated auditing rights, it seems unlikely SB 1034 is going to "mess up" too much in the music industry, but it is worth highlighting at least some of its possible side effects, namely the potential for thinner record deals for artists, the flight of labels from California, and lawyer-driven acrimony in the industry.

1. Diminished Record Contracts for New Acts

With its specific list of accounting rights and its prescribed methods for conducting royalty audits, SB 1034 is likely to bring some degree of healthy transparency to the recording industry. This transparency may come at a cost, however, and that cost could be less generous deals for new recording artists. Facing the financial pressure of online piracy and copyright infringement, n83 record labels are stretched thin in their struggle to maintain the traditional market structure. Being brittle and bruised from their war with technology, record labels could react to elevated auditing responsibilities by simply tightening the noose around new artists' necks and offering them a lower royalty rate that includes more latitude for the label but less for the artist. As recording contracts have been the backbone of the music business and virtually every new artist must go through a recording deal at some point, SB 1034 may signal a more difficult time for emerging talent ahead. New artists often must take what they are offered since they have no track record of musical success and little leverage at the negotiating table. After SB 1034, what they get from a label may be [*949] more rights to accounting sheets but less money and maneuvering power under the contract.

2. Flight of the Labels from California

Exhibit C -101

20 Berkeley Tech. L.J. 933, *

Geography may be another factor limiting the effectiveness of SB 1034. Along with California, New York and Tennessee serve as ground zero for the music industry. SB 1034 may set the stage for the exit of major record labels from California in an effort to escape its requirements. While this scenario seems unlikely given the long-standing history of the recording industry in the Golden State and the significant pool of talent that emerges from the region, it is not outlandish to envision major operations for labels moving entirely to some other jurisdiction more friendly to record companies. This could feasibly be accompanied with the labels inserting a contract provision detailing that this new jurisdiction would be the proper venue for any and all litigation arising under the terms of the contract.

### 3. A Boon for Lawyers and Accountants

Finally, aside from recording artists, SB 1034 will make at least two other groups of professionals happy: accountants and lawyers. With the enhanced power to audit and the ability to investigate suspected royalty underpayments, artists will be calling on the services of accountants to do the financial probing - and in instances of gross royalty underpayment, on an attorney to commence litigation against the label to either break the contract or demand payment. Such intrusions by two little-loved professional groups seem likely to deepen the growing divide between artist and label who have historically functioned in a symbiotic relationship. Once compared to a marriage n84 by State Senator Murray, this relationship could be reduced to a hostile war zone defined by legions of lawyers and accountants fighting their counterparts on the other side.

However, when viewed against the backdrop of other recent changes in the industry, it is unlikely SB 1034 will be a cash cow to the legal and accounting worlds or that California will see the en masse migration of record labels from its borders. Rather, the legislation is one part of the much larger evolution that is transforming the industry of music.

### C. SB 1034 Prodding Industry Self-Reform

The recording companies voluntarily implemented much of the spirit of the original SB 1034 before its diluted counterpart ever passed - one more sign of increasing pressures on the industry to change. For over two  [*950]  years, State Senator Murray had been threatening to impose change on the recording business through legislative fiat. After the 2002 legislative hearings, the senator sent this warning to record labels in a law review article: "I urge the record companies to consider the structural and accounting changes on their own to avoid legislation that would mandate contract terms, and to engage in discussions with State Legislatures and Congress about enacting those suggestions that require legislative action." n85 While opening the door for self-regulation and organic reform, State Senator Murray also made clear he would not be coy about using the blunt force of legislative action to remedy a pervasive problem in the recording industry.

Three of the label conglomerates moved quickly toward internal self-reform. Bertelsmann Music Group (BMG) n86 was the first to break ranks with industry rivals by proposing a "fairer, more transparent" accounting system for royalty payments. n87 At the end of 2002, BMG announced its sweeping changes to the way it did business with artists: it would simplify royalty computations; reduce the number of pages in a standard recording contract from 100 to 12; introduce a new contract model that would restrict the number of years an artist would be bound to the label while also opening up a new stream of shared revenue; and compute royalties based on the wholesale price of a CD rather than the suggested retail price. n88 As explained by a music industry accountant, "It's exactly what artists are crying out for. In theory, if it became a universal practice, there would be little reason for artists to ever conduct audits." n89

Feeling both peer pressure from BMG and the threat of legislative action, Universal Music Group, the largest of the record labels, next followed suit. Among other reforms, Universal announced in 2002 that it too would revamp its royalty accounting process by giving artists access to  [*951]  manufacturing documents that it had previously withheld. n90 Also significant was Universal's plan to double the size of its audit staff to enable the company to be more responsive to royalty inquiries from artists. n91 Finally, in a move to educate artists about industry accounting practices and to alleviate their suspicions, Universal announced it would hold royalty workshops twice a year. n92

In the most significant accounting reform, Warner Music Group announced in 2003 that not only would it simplify royalty calculations across the board, but it would also subject itself to self-imposed penalties in the advent of royalty underpayment. By promising to pay interest in prime rates to artists on unpaid royalties found in an audit and to reimburse acts for the costs of any audit that revealed royalty underpayment exceeding ten percent, n93 Warner Music became the first and only record company to expose itself to monetary damages for its own negligence.

Exactly what prompted the record labels to voluntarily reform their royalty accounting practices is unknown. Considering the extended length of the law's passage and the high profile senate hearings held in the state capital, SB 1034

Exhibit C -102

20 Berkeley Tech. L.J. 933, *

packed a media punch that was felt throughout the entertainment industry. State Senator Murray was able to marshal considerable momentum in his call to empower artists by catering to a national media audience with an issue that made headlines but also appealed to people's inner sense of fairness. Whether it was the negative press emanating from the senate hearings about the antiquated practices of the recording industry, or the specter of government oversight manifest through a statute which would have imposed a fiduciary duty, the bill as signed by Governor Schwarzenegger was much more narrow in its approach to industry reform. Receiving the final blessing of the RIAA, the recording artists, and the Sacramento political establishment, SB 1034 was largely able to accomplish the overly ambitious goals of the original bill sans governmental intrusion into private contracting.

[*952]

IV. CONCLUSION

By all accounts, the artist-label relationship was ripe for change, and recent events have done much to address a number of glaring problems in the recording industry. Viewed as a whole, these changes have significantly emboldened artists through more information and greater access to documents once held exclusively by the labels. The accounting self-reform enacted by three major record companies alleviates the misinformation and the suspicion an artist may have about proper royalty recording, feasibly removing the need for an audit in the first place. However, if an artist did choose to audit, SB 1034 grants her discrete audit rights and a means to defray the formidable ensuing costs. Finally, if the artist chose to sue for royalty underpayment, the Wolf decision places the burden on the record label to prove that the artist was being paid correctly. These recent actions are all incremental but decidedly prudent, as they allow the music industry to organically adapt itself to the expectations of talent and the financial realities facing labels in an uncharted digital age. Legislative actions that would impose artificial relationships and stipulate damages, such as the original bill proposed by State Senator Murray, overreach and threaten to bring enmity, rather than cooperation, to the industry. The music business has adapted to the technical innovations and evolving musical tastes of the last 100 years, and there is every reason to believe that it will continue to do so in the years to come through self-adaptation, minimal government intrusion, and cooperation between artist and label.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Contracts LawContract InterpretationFiduciary ResponsibilitiesGovernmentsFiduciary ResponsibilitiesGovernmentsLegislationStatutory Remedies & Rights

**FOOTNOTES:**

n1. 2004 Cal. Legis. Serv. 150 (West). SB 1034 modifies *California Civil Code 2500*, 2501 and is filed under the heading "Recording Artist Contracts." *Cal. Civ. Code 2500*, 2501 (West Supp. 2005). For purposes of this Note, however, I will be using the citation to SB 1034 before it was officially codified into state law.

n2. Press Release, Office of the Governor, Legislative Update 7/16/2004 (July 16, 2004), at http://www.schwarzenegger.com/en/news/uptotheminute/news_upto_en_LegisUpdate12.asp?sec=news&subsec =uptotheminute. Although the governor signed the bill in July 2004, SB 1034 did not take effect until January 1, 2005.

n3. Assembly Committee on Arts, Entertainment, Sports, Tourism, and Internet Media, 2002-2003 Leg., 1 (Cal. 2003) (presenting a bill analysis for SB 1034), available at http://www.leginfo.ca.gov/pub/03-04/bill/sen/sb_1001-1050/sb_1034_cfa_20040607_152304_asm_comm.html.

n4. 2004 Cal. Legis. Serv. 150 (West).

n5. Highlighting the pervasive suspicion held by government officials about the recording industry at the time, the California law was passed almost concurrently with New York State Attorney General Eliot Spitzer's investigations into the industry in New York. In May 2004, Spitzer announced that the five major record labels

Exhibit C -103

20 Berkeley Tech. L.J. 933, *

had signed a pact with his office agreeing to pay back royalties totaling $ 50 million owed to former recording artists. Though the California law deals with current or future royalties and the New York pact deals with former back royalties, the two actions are significantly similar with their focus on accounting discrepancies and their proximity in time to each other. Jeff Leeds, Music Giants Pay Back Royalties, L.A. Times, May 4, 2004, at C1.

n6. Chuck Philips, Artists Put Pressure on for Benefits, Pensions, L.A. Times, June. 3, 2002, at C1 [hereinafter Philips, Artists Put Pressure]; Chuck Philips, The Nation Auditors Put New Spin on Revolt over Royalties Music, L.A. Times, Feb. 26, 2002, at A15 [hereinafter Philips, Nation Auditors Spin].

n7. Chuck Philips, State Senate to Examine Music Firms Royalties: A Second Hearing on Recording Industry Accounting is Planned to Probe Allegations that Artists are Being Cheated, L.A. Times, Aug. 26, 2002, at C1.

n8. Chuck Philips, Music Labels Urged to Revise Royalties: A State Senate Panel Criticizes Record Firms' Accounting and Threatens to Take Action, L.A. Times, Dec. 3, 2002.

n9. See Philips, supra note 6, at A15.

n10. Record Label Accounting Practices: J. Hearing of the Cal. State Senate Comm. on the Judiciary and State Senate Select Comm. on the Entm't Indus., 2001-2002 Leg., 3 (Cal. 2002) [hereinafter Record Label Accounting Practices Hearing] (overview by Sen. Martha M. Escutia, Chair).

n11. See Philips, supra note 6, at A15.

n12. Id.

n13. Record Label Accounting Practices Hearing, supra note 10, at 44.

n14. Id.

n15. See 2004 Cal. Legis. Serv. 150 (2004).

n16. Lynn Morrow, The Recording Artist Agreement: Does it Empower of Enslave?, 3 Vand. J. Ent. L. & Prac. 40, 42 (2001).

n17. Entertainment Industry Contracts 159.01 (Donald C. Farber ed., 2002).

n18. See Geoffrey P. Hull, The Recording Industry 17 (2d ed. 2004).

n19. See generally Richard Buskin, Inside Tracks (1999) (compiling firsthand accounts from famous record producers about the evolution of the music business).

n20. Id. at 49.

n21. See M. William Krasilovsky & Sidney Shemel, This Business of Music 37 (8th ed. 2000).

Exhibit C -104

20 Berkeley Tech. L.J. 933, *

n22. Id.

n23. See Senator Kevin Murray, Recording Industry Practices, 24 Ent. L. Rep. 4 (2002). This structure aligned with the artists' perception of themselves as creative talent and not as business people.

n24. See Reebee Garofalo, Rockin' Out: Popular Music in the USA 200-02 (2d ed. 2002).

n25. Morrow, supra note 16, at 41.

n26. Murray, supra note 23, at 6.

n27. Until August 2004, there had been five major record labels dominating music distribution. However, in the fall of 2004, Sony Music Entertainment and Bertelsmann Music Group completed the merger of their operations. This new venture has created the world's second-largest music company, just after Universal Music Group, and highlights the state of flux afflicting the traditional music industry establishment. Media Brief, Sony Corp.: Deal Creating Music Company with Bertelsmann is Completed, Wall St. J., Aug. 6, 2004, at B6.

n28. Murray, supra note 23, at 9.

n29. Xavier M. Frascogna, Jr. & H. Lee Hetherington, This Business of Artist Management 130 (1997).

n30. Record Label Accounting Practices Hearing, supra note 10, at 71 (statement by Steve Marks, Senior Vice President of Business and Legal Affairs, Recording Industry Association of America (RIAA)).

n31. Id. For every 100 artists signed, a label can expect to have only five release a hit album. Also, labels commit an average of $ 450,000 per contract for advances and production just to launch an artist's first album. Id. at 69.

n32. Id.

n33. Id.

n34. Philips, Nation Auditors Spin, supra note 6, at A15 (quoting Wayne Coleman, an accountant whose St. Louis firm has recovered more than $ 100 million in unpaid royalties for clients).

n35. Record Label Accounting Practices Hearing, supra note 10, at 67.

n36. Id. at 70.

n37. Perhaps no other company is more symbolic of this digital revolution than Apple Computer's iTunes. Steve Jobs, Apple's prodigious CEO, has explained his vision of the future of music: "The personal computer has become the epicenter of the music-listening experience. People keep their music collections on their computers. They want to burn CDs and to put their music on portable players. Why shop at a record store?" Chuck Philips, Apple's Jobs Unveils Song Service, L.A. Times, Apr. 29, 2003, at C1.

n38. Associated Press, Rock Singers Plan Online Venture, L.A. Times, Jan. 27, 2004, at C6; see also MUDDA, at http://www.mudda.org (last visited Mar. 10, 2005).

Exhibit C -105

20 Berkeley Tech. L.J. 933, *

n39. See Recording Artists' Coalition, at http://www.recordingartistscoalition.com (last visited Mar. 10, 2005).

n40. See Future of Music Coalition, at http://www.futureofmusic.org (last visited Mar. 10, 2005).

n41. Senate Democratic Caucus, Biography of Senator Kevin Murray, at http://democrats.sen.ca.gov/templates/SDCTemplate.asp?pg=senbiography&cp=MemberPage&sln=Murray&sdn=26&zrn=Zone (last visited Feb. 16, 2005).

n42. *130 Cal. Rptr. 2d 860 (Ct. App. 2003).*

n43. *Id. at 862-63.* The motion picture that was eventually produced by Walt Disney, with Steven Spielberg's Ambin Entertainment, was Who Framed Roger Rabbit (1988). *Id. at 862.*

n44. *Id. at 862-63.*

n45. Id.

n46. Id.

n47. Id.

n48. *Id. at 863.*

n49. *Id. at 864.*

n50. Id.

n51. Id.

n52. Id.

n53. *Id. at 865.*

n54. *Id. at 866.*

n55. *Id. at 867.*

n56. Id.

n57. Id.

n58. *Id. at 868.*

Exhibit C -106

20 Berkeley Tech. L.J. 933, *

n59. Murray, supra note 23, at 5.

n60. Robert Flannigan, Commercial Fiduciary Obligation, *36 Alberta L. Rev. 905, 906 (1998)*. Flannigan explains in his article that "fiduciary responsibility, like all forms of legal responsibility, is a product of social policy. In the fiduciary context, the operative social norm is the desire to inhibit opportunism." Id.

n61. *37 Am. Jur. 2d Fraud and Deceit 32* (2004).

n62. *Restatement (Second) of Agency 13* (2004); Murray, supra note 23.

n63. *Barbara A. v. John G., 193 Cal. Rptr. 422, 431 (Ct. App. 1983)* (citation omitted).

n64. See Philips, Artists Put Pressure, supra note 6, at C1 (describing how Motown diva Mary Wells was so destitute at the end of her life that the "First Lady of Motown" was forced to check into a charity ward of the country medical hospital to receive treatment).

n65. See Philips, Nation Auditors Spin, supra note 6, at A15 (stating that singer Peggy Lee and 300 other performers obtained a $ 4.75-million settlement in a class-action suit that accused their record company of cheating them out of royalties from back to the 1940s and describing recent efforts by the Recording Artists Coalition to raise funds and lobby lawmakers for fairer record contracts).

n66. According to Senator Martha Escutia, Chair of the Senate Judiciary Committee, the Judiciary Committee co-chaired the hearings due to reports that past recording artists had to rely on public assistance because they were shortchanged their royalty earnings during their careers. Senator Escutia explained that "if public tax dollars are being spent to support artists who were cheated out of their royalty earnings, we need to shift the burden back to where it belongs: to the record labels that failed to pay the artists their rightful earnings." Record Label Accounting Practices Hearing, supra note 10, at 1 (overview by Sen. Martha M. Escutia, Chair).

n67. Assembly Committee on Arts, Entertainment, Sports, Tourism, and Internet Media, 2002-2003 Leg., 1 (Cal. 2003) (presenting a bill analysis for SB 1034), available at http://www.leginfo.ca.gov/pub/03-04/bill/sen/sb_1001-1050/sb_1034_cfa_20040607_152304_asm_comm.html.

n68. Assembly Committee on Arts, Entertainment, Sports, Tourism, and Internet Media, 2003-2004 Leg., 1-2 (Cal. 2004), available at http://www.leginfo.ca.gov/pub/03-04/bill/sen/sb_1001-1050/sb_1034_cfa_20040607_152304_asm_comm.html.

n69. Murray, supra note 23, at 6.

n70. *Cal. Civ. Code 3294(a)* (West 2004); 23 Cal. Jur. 3d Damages 137.

n71. Murray, supra note 23, at 7.

n72. Id.

n73. See Philips, Nation Auditors Spin, supra note 6, at A15 (statement by veteran music accountant Fred Wolinsky of Sherman Oaks, CA).

Exhibit C -107

20 Berkeley Tech. L.J. 933, *

n74. 2004 Cal. Legis. Serv. 150 (West).

n75. Id.

n76. Id.

n77. Murray, supra note 23, at 7.

n78. *Wolf v. Superior Court, 130 Cal. Rptr. 2d 860, 867-68 (Ct. App. 2003).*

n79. *Id. at 868.*

n80. Record Label Accounting Practices Hearing, supra note 10, at 44 (statement by Mr. Londell McMillan, General Counsel, Artist Empowerment Coalition).

n81. Id. at 45 (statement by Sen. Ray Haynes).

n82. Id. at 45-46.

n83. Id. at 3.

n84. Murray, supra note 23, at 5.

n85. Id. at 9-10.

n86. This announcement from BMG came nearly one year before its merger in late 2004 with Sony Music Group. The newly merged label, Sony BMG, is owned equally by the two media giants and it remains to be seen what type of lasting reform will endure in this new corporate structure. See Media Brief, supra note 27, at B6.

n87. Chuck Philips, BMG to Roll Out Royalty Plan: The Move Could Help Ease the Controversy Over the Industry's Accounting Practices, L.A. Times, Nov. 20, 2003, at C1.

n88. Id. Royalties based on wholesale prices or suggested retail prices will likely be the same, but the benefit for artists will be in the form of simplified royalty statements. "For instance, an artist with a 12% royalty based on the suggested retail price of $ 17.98 per CD typically earns about $ 1 - after the company extracts a bevy of deductions. Under BMG's plan, the same artist will receive a 9% royalty based on the wholesale price of $ 11.41 per CD, with no deduction, still receiving about $ 1." Id.

n89. Id. (statement by Phil Ames, a music industry accountant who has performed countless audits for recording artists).

n90. Contracts require labels to compensate artists on records sold, not manufactured. Therefore, labels historically only provided artists with records of sales during audits. The fact that the manufacturing records were withheld from auditors caused suspicion among artists who accused labels of selling albums manufactured overseas without accounting for them in royalty statements. See Chuck Philips, California Universal Music to Redo Royalties: Firm Becomes Second to Respond to Concerns About the Industry's Accounting Practices, L.A. Times, Nov. 28, 2002, at C2.

Exhibit C -108

20 Berkeley Tech. L.J. 933, *

n91. Id.

n92. Id.

n93. Chuck Philips, Warner Rolls Out Royalty Reforms: Record Company Says Move Will Make it Easier for Acts to Determine What They are Owed, L.A. Times, Mar. 20, 2003, at C1.

Exhibit C -109